SIMON P. DOUTHART, EXT.

*v.*

FRANK G. LOGAN *et al.*

*Opinion filed April 18, 1901—Rehearing denied June 5, 1901.*

1. PARTNERSHIP—*partners may agree that good will of business shall not be an asset.* Partners may contract with each other that there shall be no good will to be considered as property or as an asset of the co-partnership; and such a contract may be expressly made, or it may be implied from other contracts and the acts and conduct of the parties in interest.

2. SAME—*rule as to division of profits earned after death of one partner.* The executor of a deceased partner is entitled to that portion of the profits earned by the wrongful use of his intestate's capital, in continuing the business, which such capital bears to the entire capital of the firm, or, at his option, to have such share of the capital returned, with interest; and this is true, although by the partnership articles the deceased partner was receiving a greater share of profits than his portion would be if based on his capital.

*Douthart* v. *Logan*, 86 Ill. App. 294, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

The following, made by the Appellate Court, is a correct statement of this case:

"Appellant filed his bill in the circuit court of Cook county against appellees for an accounting of the co-partnership business of F. G. Logan & Co., a firm composed of appellant's testator and appellees, and also of the co-partnership business of the firm of F. G. Logan, which latter firm was composed of the appellees, and asking that the appellees pay the amount which might be found due on such accounting to appellant; also asking that a receiver be appointed to sell the partnership property, (including the good will,) to collect the assets and fully wind up the co-partnership of F. G. Logan & Co.

"Appellees answered the bill, to which replication was filed, and the cause was consolidated, with an appeal by appellant to said circuit court from certain proceedings in the probate court of Cook county in the estate of Daniel Butters, deceased, in which the probate court denied an application for a rule on the surviving partners of F. G. Logan & Co. to inventory certain open accounts of that firm, and overruled the objections of the executor to and approving the partnership inventory and appraisement and supplemental partnership inventory.

"A hearing of the consolidated causes was had before the chancellor, which resulted in a decree finding the facts substantially as hereinafter stated, confirming the inventories and appraisement in the probate court, and decreeing that all the doings of appellees, as surviving partners of F. G. Logan & Co., were proper and correct, and as members of the firm of F. G. Logan; that appellees did right in failing to inventory a good will of the firm of F. G. Logan & Co., in appraising the leases of said firm as being of no value, in failing to inventory the open trades of said firm, and that the sum of $1154.68 paid by appellees to appellant on December 28, 1898, is six thirty-seconds of all the profits of the business of F. G. Logan & Co. collected by appellees since October 10, 1896, and is all thereof to which appellant is entitled. The decree also directs appellees, as surviving partners, to collect the remainder of the choses in action in their hands belonging to the firm of F. G. Logan & Co., make account thereof to said probate court, and pay to appellant six thirty-seconds thereof, after deducting expenses of collection. The decree further directs that appellees pay to appellant the sum of $2163.88, which the court finds is six thirty-seconds of the net profits of the business of the firm of F. G. Logan & Co., as carried on by appellees, from the 12th day of August to the 10th day of October, 1896, less the sum of $523.77 theretofore paid

by appellees as surviving partners to said appellant, to-wit, the sum of $1640.11.

"From this decree the appeal herein is taken, and both errors and cross-errors are assigned. The appellant claims that the court erred in not requiring appellees to account for the good will of the business of the firm of F. G. Logan & Co., and for certain leases and open trades belonging to that firm, and not requiring appellees to account for the net profits earned by them after the 10th day of October, 1896, while doing business under the firm name of F. G. Logan, and also in rejecting certain evidence of an expert witness, which, it is claimed, would show the existence and value of the good will. Appellees, under their cross-errors, claim that the court erred in requiring them to account to appellant for six thirty-seconds of the net profits of the business of F. G. Logan & Co. from August 12 to October 10, 1896, instead of one twenty-fourth of such profits.

"The evidence shows that from about the year 1877, and up to the filing of the bill in this case, the appellee Frank G. Logan had been engaged in the commission business in the city of Chicago, being associated with different persons as partners during that time, and that for sixteen years prior to 1896 the firms with which he was associated bore the firm name of F. G. Logan & Co. In January, 1891, he became associated in business with Daniel Butters and two other persons, and the partners of the firm were changed five times thereafter, in 1893, 1894 and in 1895, both Logan and Butters, however, remaining members of the different firms existing during that period, and the firm being known as F. G. Logan & Co. On March 1, 1896, written articles of co-partnership were entered into between said Butters and appellees, which provided that the business of commission merchants should be carried on by the firm in Chicago and elsewhere under the firm name of F. G. Logan & Co., from March 1, 1896, to the last day of February, 1897, the capi-

tal of the firm to be $120,000, of which Frank G. Logan
was to contribute $114,000, appellee Theron Logan $1000,
Butters $5000 and appellee Bryan nothing,—Frank G.
Logan to have nineteen thirty-seconds of the profits and
also to draw monthly from the moneys of the firm $900; ·
Butters to have six thirty-seconds of the profits and draw
monthly $500; Theron Logan to have two thirty-seconds
of the profits and draw monthly $250, and Bryan to have
five thirty-seconds of the profits and draw monthly $500,
the several amounts to be drawn by the several partners
to be charged to the expense account of the firm.   The
losses of the business were to be borne by the respective
partners in proportion to their respective interests in the
profits thereof.   It was also provided that any partner
might withdraw from the firm on thirty days' written
notice, and should have the right to withdraw the just
share of the capital and profits to which he should be en-
titled at the time of his withdrawal, but that his monthly
allowance provided by the contract should cease on the
date of such withdrawal.

"Butters died August 12, 1896, leaving a will, by which
he appointed appellant his executor, who qualified as
such.   At that time the firm of F. G. Logan & Co. occu-
pied a room in the Board of Trade building in Chicago
under a sub-lease from F. G. Logan to the firm, from April
1, 1896, to March 31, 1897, at a yearly rental of $3800, pay-
able in equal monthly installments.   The lease provides
that the room should be used for the transaction of the
firm business and for no other purpose, and in case of
default in any of its covenants by the lessee the lessor
could declare the lease ended and re-enter the premises,
and also that the lease should not be assigned nor the
premises let or under-let without the written consent of
the lessor, and in case of a breach of this covenant the
lease should be void, at the election of the lessor.   Frank
G. Logan at this time had a lease of the same room from
the Board of Trade to himself from May 1, 1896, to April

30, 1897, at the same rental he charged the firm, and also a prior lease which expired on April 30, 1896. He also had had other leases of the same room, the first of which commenced May 1, 1894, and expired April 30, 1895, and the second lease, the same that is above referred to, which expired April 30, 1896. He sub-let the room to the different firms in which he was a partner, each sub-lease expiring at a date prior to the expiration of his lease. The firm also had leases of private telegraph wires from different telegraph companies between different large cities in the United States, principally between Chicago and other cities, at large yearly rentals, all of which leases were subject to cancellation by either party at any time on thirty days' notice, and any one could get a similar lease by paying similar rents. These wires were used to transmit orders to the firm and for giving information by the firm as to the condition of the markets. Each of the partners had an individual membership in the Board of Trade of Chicago, and Frank G. Logan owned a membership upon the New York Stock Exchange.

"The commission business as conducted by the firm was largely a personal matter, and its extent depended upon the personal acquaintance of the different members of the firm. It was speculative, and its extent depended very largely upon the personal confidence or trust of the different clients in the judgment of the particular partner of the firm who was called upon to transact the business. In many instances the names of the customers did not appear upon the firm's books except by numbers, the identity of the particular customer being known only to the member of the firm with whom he entrusted his business. Settlements were made at the time of the several changes in the partners of the firm of F. G. Logan & Co., above referred to, in which the different partners receipted, each to the other, for all claims to accounts due to the old firm, and on one occasion, June 22, 1895, the partners endorsed in writing a trial balance of their

books, which they stated contained all the assets and liabilities of the old firm, and thereby receipted 'in full, each to the other, everything up to date.' There was no mention, at any time, of good will on the books of the different firms of F. G. Logan & Co., of which Butters was a member. Butters did not contribute any capital to any of the different firms of F. G. Logan & Co. in which he was a partner prior to March 1, 1896.

"At the time of the death of Mr. Butters the firm had on hand a large number of open trades, which extended for long periods, and in some instances for six months thereafter. These trades were of such a nature that the firm could not realize upon them until they expired, except by the order of the customer, and could earn no commissions thereon nor make any charges against the customers until the trades were closed. To close these open trades required that the business of the firm should be carried on for at least the period of six months, which would have entailed an expense of about $10,000 per month, which was about ten times the value of the open trades to the firm. Appellees took these open trades, and the full commissions, when they were settled up, to which the firm would then have been entitled, and credited the firm of F. G. Logan & Co. with one-half of that amount.

"After the death of Mr. Butters appellees continued to do business until October 10, 1896, under the firm name of F. G. Logan & Co., at the same place, with the same capital and in the same manner as they had transacted business prior to his death. During this time they acted under the advice of appellant, who is an attorney at law. Appellant told appellees, about the first of October, 1896, that inasmuch as he was trustee and executor under the will of Mr. Butters they should get another attorney. Appellees thereupon procured other counsel and proceeded at once to settle the partnership estate in the probate court. On October 10, 1896, they sent the

following telegram over their wires to all customers who had open trades with the firm, to-wit:

" 'Owing to the death of our late partner, Daniel Butters, and the dissolution thereby of the partnership heretofore carried on under the firm name of F. G. Logan & Co., of Chicago, composed of Frank G. Logan, Daniel Butters, Ben. B. Bryan and Theron Logan, said firm has ceased doing business, and a new partnership has this day been formed by the undersigned for the transaction of a general commission business, under the firm name of F. G. Logan. If you desire us to transfer your open trades or balances to the new firm, kindly wire us to that effect; otherwise wire us what other disposition to make of them.

CHICAGO, *October 9, 1896.*      FRANK G. LOGAN,
                                  BEN. B. BRYAN,
                                  THERON LOGAN.'

"They also at the same time published a similar notice in leading newspapers in Kansas City, New York, Minneapolis, St. Louis and Chicago. Appellees also formed a new partnership under the name of F. G. Logan, opened a new set of books, and, in all instances where ordered, transferred the trades of F. G. Logan & Co. to the books of the new firm. On the same date appellees tendered to appellant the sum of $9812.60, being $4257.83 for Butters' proportion of the profits in the firm of F. G. Logan & Co. up to August 12, 1896, which was six thirty-seconds of such profits; also $523.77 for Butters' interest in the profits of said firm from August 12 to October 10, 1896, being one twenty-fourth of such profits, his monthly allowance as provided by the partnership articles being deducted; also $31 as the share of Butters in the furniture belonging to said firm, being six thirty-seconds of its appraised value; and also $5000, being for the capital contributed by Butters to the capital stock of said firm. Appellant received from and receipted to appellee Frank G. Logan for said total amount, but qualified his receipt by stating that it should not be taken or considered as a final or full settlement of the interest of Butters in the assets of said firm, but for money paid on account of the same.

"October 7, 1896, appellees, as surviving partners of the firm of F. G. Logan & Co., caused to be appointed appraisers of the partnership estate by the probate court of Cook county, and thereafter they filed an inventory and supplemental inventory in said probate court of the partnership estate, in which was included the lease of the room in the Board of Trade building and also said wire leases, but they did not include any good will of the late firm nor said open trades. The report of the appraisers set down the said leases as being of no value. Appellees filed in said probate court a report, showing, among other things, that they had closed out said open trades of the late firm and charged one-half the commissions to be derived therefrom by the late firm to themselves; although said trades had not been consummated. and could not be consummated until an order should be received from the customers directing the closing thereof, and no commissions had been earned or collected by appellees at the time of the death of said Butters. The one-half of the full commissions was thus included in the report of the profits of the late firm up to August 12, 1896,—the date of Butters' death. The whole report thus made to the probate court included the total amount coming to' the estate of said Butters from appellees, to-wit, $9812.60, as above stated, as having been paid over to appellant by appellees.

"The said inventory, supplemental inventory and report of appraisers was approved by the probate court, and the same were found to be correct by the chancellor, except as to the item of net profits of the late firm from August 12 to October 10, 1896, which was modified by the chancellor, who found that appellant was entitled to six thirty-seconds of such profits instead of one twenty-fourth, as stated in said report to the probate court, and which made a difference of $1640.11 in favor of appellant, which was directed to be paid to him by appellees. It was further found by the decree,—and the evidence,

in our opinion, sustains the findings,—that there was no good will of the firm of F. G. Logan & Co. at the date of Butters' death or since, and none was contemplated between the partners, and that said firm did not own a membership in the Chicago Board of Trade nor in the New York Stock Exchange; also, that from and after October 10, 1896, appellees did not carry on any business under the name of or belonging to F. G. Logan & Co., nor use any property of that firm in the business of F. G. Logan, but as surviving partners did promptly, and as was their duty, collect the accounts and choses in action belonging to said late firm and rendered an account thereof to appellant, and did pay over the same to him, except as specially found by said decree and hereinabove referred to. It further appears from the evidence that at the death of Butters the capital of F. G. Logan & Co. was unimpaired, and that the estate of Butters was entitled to $5000, or the one twenty-fourth part thereof, which was paid to appellant by appellees; also, that the lease to the firm of the room in the Board of Trade building, and also the said wire leases, were canceled on the 10th of October, 1896, by appellees, by indorsing the cancellation thereof on the face of such leases; also, that said leases were of no value. It further appears, though not found by the chancellor, that prior to and up to the death of Butters the firm of F. G. Logan & Co. did a large and profitable business, the net profits amounting the year prior to Butters' death to $60,000, and had a large list of customers, with their addresses, who were scattered over a vast territory in the United States; also, that after the 10th of October, 1896, appellees, under the name of F. G. Logan, did at once commence to do a large business, and earned a net profit of more than $5000 per month.

"The only oral evidence received on the hearing was that of Frank G. Logan."

DOUTHART & BRENDECKE, for appellant.

HAMLINE, SCOTT & LORD, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

Counsel on both sides have evinced great research and ability in their argument of the question whether or not there was a good will in the partnership business of F. G. Logan & Co., which, upon the death of one of its members, Daniel Butters, should have been inventoried and caused to be appraised by the surviving partners, and sold by the order of the court for the benefit of the co-partnership estate. It would be interesting to consider the question as a legal one, so fully argued by counsel, whether or not the business was of such a character as that, independent of contract, there would be a good will belonging to the partnership. We are satisfied, however, from a careful consideration of the evidence, that, as a question of fact, there was no good will as an asset of the firm, and that it was intended by the co-partners that there should be none. It cannot be doubted that it would have been competent for the partners to contract with each other that there should be no good will, to be considered as property or as an asset of the co-partnership. Such a contract might be expressly made, or it might arise by implication from other contracts and the acts and conduct of the parties in interest. From the time Butters became interested with F. G. Logan as a partner, in 1891, until his death, in 1896, there were not less than five different partnerships of which they were constituent members, formed, conducted, dissolved and settled in a formal, business-like manner, each of them limited in duration to a year or less time, and, as a rule, each different from the others as to its membership, except that F. G. Logan and Butters were members of each successive firm. Logan had been in the business for many years, and if there had been a good will it would

have been one chiefly of his own creation. In none of these several partnerships, nor upon the books, was any account taken or mention made of any good will, and each was dissolved and fully settled, releases were signed and receipts passed between the partners without regard to or mention of any good will of the business. On March 1, 1894, at the termination of the co-partnership for the year then expiring, Butters, by his writing, assigned to F. G. Logan and F. K. Dunn, members of the then late firm, among other things, all his right, title and interest in and to all the assets, of every name, nature and description, then or theretofore belonging to said firm of F. G. Logan & Co.; and in March, 1895, upon a dissolution and settlement of the succeeding co-partnership, Butters executed a similar assignment, not so comprehensive in its language but apparently intended to settle and dispose of his partnership interests in the then late firm, and the several partners, including Butters, wrote upon the face of the balance sheet of their several partnership accounts, and signed, the following:

"We have examined the trial balance as shown by our books March 1, 1895, which represents all assets and liabilities, of every kind, of the present firm of F. G. Logan & Co., closing absolutely all old affairs and books up to that date to the entire satisfaction of each one of us, and we hereby give receipts in full, each to the other, for everything up to that date.

"Dated at Chicago, June 22, 1895.      F. G. LOGAN,
                                       D. BUTTERS,
                                       F. K. DUNN."

On the same date a new firm was formed, under the same name, by Logan, Butters and Dunn, which was dissolved in October of the same year by Dunn's retirement, and a new firm was then formed by Logan, Butters and Theron Logan, to expire March 1, 1896. In the settlement with Dunn no account was had or mention made of any good will, and in the written adjustment it was stipulated as follows: "Each member has examined all ac-

counts and books and found them satisfactory, that they are closed to date, except as to bills receivable, and they agree and receipt, each to the other, in full as above." A similar settlement and receipting was had March 1, 1896, when the firm was formed which existed when Butters died, in August of the same year. The two Logans, Butters and Bryan constituted this firm. Each person, on becoming a member of the firm, paid in the amount of capital as stipulated in the articles of co-partnership, but was not charged anything for good will. In none of the contracts or books or settlements or receipts was a good will ever mentioned, but the written assignment of Butters to Logan and Dunn, in 1894, was comprehensive enough to pass all interest he might then have had in any such good will. No new member coming into any of the different partnerships which were formed ever paid anything for good will of the business, and no retiring partner ever received anything for any such good will. Butters paid nothing for it, and if he acquired such an interest by virtue of the partnership relation prior to 1894, he then assigned it to Logan and Dunn, and his subsequent settlements, receipts and conduct precluded the idea that there was any good will of the business in which he had any interest. Logan had not contracted away his right to do business in his own name, and he had a right to organize a new firm to do business in his own name on the dissolution of the old. The partnership lease of the place of business was of no assignable value because it was not assignable, but was voidable at the option of Logan. The leases of private wires were equally valueless for purposes of transfer beyond the rental, for they were at will, and such wires could be had by any one for the same prices. We are satisfied, therefore, that the surviving partners did right in not including in their inventory a good will of the business, and that the chancellor of the circuit court properly held that there was no good will to be accounted for or sold.

As to the open trades which the firm had at the death of Butters, his estate was credited with his proportion of one-half of the commissions which were earned when they were fully carried out and settled. The evidence shows that in crediting the old firm with one-half of such full commissions the new firm really created for and allowed to Butters' estate a fund which it would not otherwise have received. It was necessary to carry on the business at an expense much greater than their value to realize anything from them. No sale or other disposition could have been made of them to the advantage of any one, and the plan adopted produced much more for Butters' estate than could have been realized in any other way. His executor has no ground of complaint.

The only question remaining to be considered relates to the proper division of the profits realized by the surviving partners in carrying on the business of the late firm after Butters' death, on August 12, 1896, until October 10, 1896, when they ceased to do so and organized the new firm. Under the articles of agreement Butters, while he contributed but one twenty-fourth of the capital, was entitled to six thirty-seconds of the business, and by the decree of the circuit court his executor was allowed the same share of the profits after the death of Butters and while the business of the late firm was continued by the surviving partners as was provided for Butters in the partnership contract. The Appellate Court, however, reversed this part of the decree and held that appellant was entitled to only one twenty-fourth of such profits,—that is, to a share in the profits in the same ratio that Butters' capital, used and employed by the surviving partners in the business, bore to the whole profits made during such period. We are of the opinion that the decision of this question by the Appellate Court was correct. By the death of Butters the partnership was *ipso facto* terminated. Neither partner continued, as before, to be the agent of the others in the partnership affairs,

and it became the duty of the surviving partners to pro-
ceed at once to settle the partnership estate. The sur-
viving partners became trustees, on the death of Butters,
of the partnership estate, and sustained the fiduciary re-
lation of trustee to Butters' executor, the *cestui que trust*,
in the matter of Butters' interest. (*Nelson* v. *Hayner*, 66
Ill. 487; *Galbraith* v. *Tracy*, 153 id. 54.) After the death
of Butters there was a community of interest between
the surviving partners and the representative of Butters'
estate in the adjustment of their partnership interests,
but the partnership had only a limited continuance for
that purpose. (*Nelson* v. *Hayner, supra.*) In continuing
the business the surviving partners could no longer bind
Butters or his estate and no longer had the benefit of his
services, and the contract of partnership as to any new
business being at an end, it ought not necessarily to fur-
nish a basis for the division of such profits, but, on the
contrary, the fiduciary relation which the surviving part-
ners sustained to the representative of Butters' estate in
the use of his capital and property in the business as con-
tinued by them, should, in the application of the facts,
furnish the proper guide. And the rule which the au-
thorities seem to have laid down in such cases, and which
appears to be the equitable one, is, that the represen-
tative of the estate of the deceased partner is entitled
to that proportion of the profits earned by the wrongful
use of the deceased partner's capital in continuing the
business by the surviving partners which such capital
bore to the entire capital of the co-partnership,—which
in this case was one twenty-fourth,—or, at the option of
such representative, to have his share of the capital re-
turned, with interest thereon. (Lindley on Partnership,
—Ewell's ed.—976; *Robbinson* v. *Robbinson*, 146 Mass. 167;
*Freeman* v. *Freeman*, 142 id. 98; *Durbin* v. *Barney*, 14 Ohio,
311; *Burnie* v. *Vandever*, 16 Ark. 616; *Gates* v. *Finn*, L. R.
13 Ch. Div. 839.) In the case at bar, the executor of But-
ters was the attorney of the firm, and the business was

continued by the surviving partners in good faith, with his knowledge and acquiescence but without any agreement with him, for the period mentioned of nearly two months. The surviving partners accounted for and paid to him the one twenty-fourth part of such profits, together with Butters' share of the capital, and we are of the opinion that this was all they were required to do.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*