(No. 11898.—Reversed and remanded.)
PAULINE WITKOWSKY, Plaintiff in Error, *vs.* CHARLES E.
Affeld *et al.* Defendants in Error.

*Opinion filed April 17, 1918—Rehearing denied June 5, 1918.*

1. PARTNERSHIPS—*surviving partners occupy fiduciary relation to representative of deceased partner.* Surviving partners on the death of one of the firm are charged with the duty of proceeding at once to settle up the partnership estate, and such partners occupy a fiduciary relation to the representative of the deceased partner and are bound to exercise good faith toward such representative until the business of the firm is closed up.

2. SAME—*when contract continues fiduciary relation of surviving partners.* Where a contract is entered into between the surviving partners of an insurance firm and the representative of the deceased partner, with the intention of maintaining the same relation which existed after the death of the deceased partner for closing up the business, the relations between the parties will continue to be of a fiduciary nature during the existence of the contract and the utmost good faith is required.

3. SAME—*good will is a partnership asset.* The good will of a partnership is an asset in which the estate of a deceased partner is entitled to share and which must be sold as part of the assets of the firm, and when it has any value a due proportion belongs to the estate of the deceased partner.

4. SAME—*underwriting records of an insurance firm are assets.* The underwriting records and books of an insurance firm are valuable as assets upon the settling up of the partnership estate after the death of a partner.

5. SAME—*equity will entertain a bill to enforce contract where fiduciary relations exist.* Where surviving partners have entered into an agreement with the representative of a deceased partner, imposing duties which tend to establish confidential relations between the parties, a court of equity will protect the parties in interest against the wrongdoing of their associates in matters involving trade secrets although part of the bill prays for an injunction to restrain the breach of a negative covenant.

6. SAME—*equity will restrain agents from using trade secrets to their own advantage.* Any persons who in the capacity of agents have obtained the custody of the books and documents of their principals or have come into possession of secrets relating to their affairs may be restrained from making them public or from using them for their own advantage.

7. SAME—*equity may appoint receiver where rights of parties cannot be otherwise protected.* A court of equity, having jurisdiction of a bill to enforce a contract between the surviving partners of an insurance firm and the representative of a deceased partner, by the terms of which the underwriting records of the business of the old firm, containing trade secrets, are to be used by the parties in carrying on the business of the two new firms, may appoint a receiver if on a hearing on the merits it is shown that the interests of all parties cannot otherwise be fully protected.

8. CONTRACTS—*confidential relations may arise out of an express contract.* If there is an express contract existing between the parties with reference to a certain subject matter there cannot exist an implied contract between the same parties as to the same subject matter, but it does not follow that confidential and fiduciary relations cannot arise out of an express contract.

9. SAME—*when the rule that equity will not interfere where one of the parties may nullify the relief granted does not apply.* Relief in equity will not be granted in a certain class of cases where power rests in one of the parties to the contract to nullify the relief granted, but the rule does not apply where the relief may be effective to prevent one party from executing the contract in his own interest in such a way as to obtain an unfair advantage over the other interested party.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

OSCAR M. WOLFF, for plaintiff in error.

RICHBERG, ICKES, DAVIES & LORD, (DONALD R. RICHBERG, and J. S. LORD, of counsel,) for defendants in error.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This is a bill for the appointment of a receiver and for an injunction filed by plaintiff in error, Pauline Witkowsky, in the circuit court of Cook county, with relation to the right of access to and method of use of certain insurance records. Defendants in error filed a demurrer to the

amended and supplemental bill. The demurrer was sustained and the bill dismissed for want of equity. The case was taken to the Appellate Court for the First District, where the decree of the trial court was affirmed. The case has been brought to this court on petition for *certiorari.*

From the allegations of the amended and supplemental bill it appears that commencing about 1872 Conrad Witkowsky and Charles E. Affeld were partners as insurance agents in Chicago, and for many years seemingly enjoyed a large and profitable business writing fire and several other forms of insurance. They continued as equal partners in the business until 1912, when Witkowsky became ill and unable to devote all his time and energy to the business. Therefore on December 30, 1912, a contract was entered into between Witkowsky and Affeld, the details of which are unnecessary to set out but which provided, in general, that thereafter Witkowsky was to have a one-third interest in the business and profits and Affeld the remaining two-thirds, provided, however, that Witkowsky's one-third profits should not be less than at the rate of $3500 per annum from and after May 1, 1913. This arrangement continued until April 2, 1914, when Witkowsky died. By his will his widow, Pauline Witkowsky, was made executrix and sole devisee and legatee. This will was duly probated in the probate court of Cook county. Witkowsky had one son, James, who had been connected with this business for many years before his father's death, and Affeld had a son, Charles E., Jr., who had also been connected with the business for some time. After Witkowsky's death his widow and son, James, decided to engage in the insurance business under the name of Witkowsky & Co., and Affeld and his son, together with Albert Tonk, who had been an employee of the old firm for many years, also formed a partnership under the name of Affeld, Tonk & Co. It further appears from the said allegations that in the insurance business one of the most valuable assets is the records, consisting largely of (1) ap-

plications, being the original records from which policies are issued and containing considerable information as to the property and the persons taking out the policies; (2) expiration books, showing when the various policies expired and needed to be renewed; (3) block books and maps, showing the division of Chicago and various suburbs into blocks and streets and the character of the buildings in said divisions; (4) endorsements as to changes that had occurred since the writing of the policies, such as change of address of the insured and change of title; and as to personal property, change of location of the insured property. As the result of their long years of business partnership Witkowsky & Affeld had quite a large and complete set of such records. A part of the business of the old partnership was done directly with the persons owning the property insured and part was brought in by brokers, who secured orders from the property owners and took out the insurance from the firm as agents of the various companies. Shortly after the forming of the two partnerships friction developed between them as to the use of these records, which were kept in the office of Affeld, Tonk & Co. Thereupon, some time during the month following the death of Conrad Witkowsky, his widow filed a suit in the circuit court of Cook county for an injunction against the firm of Affeld, Tonk & Co., and after hearing some of the arguments the chancellor stated informally that in his opinion Pauline Witkowsky and Affeld had equal rights to the use and inspection of such records. Thereafter a contract was entered into between the parties, setting out in considerable detail the manner in which the records should be used by both the parties to the contract, and the suit was dismissed by the agreement of all concerned. This written agreement was dated May 20, 1914, and after reciting the situation that had arisen and providing for an inventory of partnership property in the probate court and as to the settlement of the partnership affairs up to the time of Witkowsky's death

and for the business that had been done by the two firms since then, it provided as to some of the most important things with reference to the settlement as follows:

"*First*—That the parties hereto intend by this agreement to effect a complete adjustment of the controversies between them concerning the rights and obligations of the respective parties arising out of the dissolution of the firm of Witkowsky & Affeld by the death of Conrad Witkowsky, (except as provided in section 8 hereof,) to define the interests of the respective parties in the assets and records of said dissolved partnership and arrange for the care, custody, use of and accounting for the same. * * *

"*Fourth*—That all records, documents and papers of the firm of Witkowsky & Affeld shall be held in the care, possession and custody of the firm of Affeld, Tonk & Co.; * , * * that for the purpose of completing the records of the firm of Witkowsky & Affeld all of the parties hereto shall cause to be inserted or placed in the proper place in the records of said Witkowsky & Affeld a complete underwriting record of all policies or business renewed by any of the parties hereto during the period from April 2, 1914, to the date of this contract; that so long as either of the present members of the firm of Witkowsky & Co. is in the insurance business in Chicago such member is to be given unrestricted access to and use of the underwriting records of Witkowsky & Affeld, in accordance with the following terms and conditions: * * *

"(*b*) The said James Witkowsky, and Albert E. Tonk of the firm of Affeld, Tonk & Co., shall, not later than twenty-five (25) days prior to the first day of each month, jointly examine the said underwriting records, (excepting only such policies as are known as 'street business,') * * * classifying and designating all policies expiring during the month for which examination is being made in the following manner: (1) 'Affeld business,' being those policies which James Witkowsky and Tonk agree are controlled by C. E. Affeld, Albert E. Tonk or C. E. Affeld, Jr.; (2) 'Witkowsky business,' being those policies which said James Witkowsky and Tonk agree were formerly controlled by Conrad Witkowsky or are now controlled by Pauline Witkowsky or James Witkowsky; (3) 'Office business,' being those policies which the said parties cannot agree to classify as Affeld business or Witkowsky business; (4) 'Brokers' business,' being those policies written by said firm of Witkowsky & Affeld for insurance agents or brokers other than Class one (1) agents, as hereinbefore specified.

"(*c*) It is agreed by and between the parties hereto that each party shall utilize for his sole benefit the records of the business designated by the name of such party and will not utilize any in-

283 – 36

formation contained upon the underwriting records of the policies designated by the name of the other party. * * *

"(*d*) The said James Witkowsky shall have unrestricted access to and use of all of the underwriting records of Witkowsky & Affeld, together with the right to make transcripts therefrom, so far as he may need such access, use or transcript in order to properly solicit, write or handle Witkowsky business, Office business or Brokers' business, as hereinabove specified. * * *

"(*e*) All future cancellations of policies included in the underwriting records of Witkowsky & Affeld shall be left in the files in order that they may be discovered by said James Witkowsky and Albert E. Tonk in making the said monthly examinations, and the said Affeld, Tonk & Co. shall promptly give to said Witkowsky & Co. information of the change of date of expiration of any such policies.

"(*f*) Pauline Witkowsky is to have full use of the said underwriting records or of any books of account of Witkowsky & Affeld for the purpose of compiling a mailing list of customers in Witkowsky business, Office business and Brokers' business, excluding brokers' customers. * * *

"*Fifth*—In the event that at any time during the term of this contract none of the present members of the firm of Affeld, Tonk & Co. shall be engaged in the insurance business in the city of Chicago, as above specified, then the said underwriting records hereinabove specified shall become the sole and exclusive property of the firm of Witkowsky & Co. or the surviving or continuing members thereof, and in the event that at any time during the term of this contract none of the present members of the firm of Witkowsky & Co. shall be engaged in the insurance business in the city of Chicago, as above specified, then the underwriting records hereinabove specified shall become the sole and exclusive property of the firm of Affeld, Tonk & Co. or the surviving or continuing members thereof.

"*Sixth*—It is agreed between the parties hereto that within ten days after the said James Witkowsky and Tonk complete each examination of the said underwriting records for any month, the said C. E. Affeld, or Affeld, Tonk & Co., will furnish to Witkowsky & Co. expiration notices of all policies expiring during the month for which examination has been made in the classifications hereinbefore designated as Witkowsky business, Office business and Brokers' business, which said expiration notices shall be prepared in the ordinary form heretofore used by Witkowsky & Affeld, and all the parties hereto covenant and agree that they will not utilize the said underwriting records, or any of the information therein contained, to solicit the renewal of policies expiring in any month

until the said expiration notices for said month have been delivered to all parties hereto.

"*Seventh*—It being the intention of the parties hereto to preserve, so far as possible, for common benefit such good will as may survive the dissolution of the firm of Witkowsky & Affeld, to avoid wasteful competition and injury to the business, assets and reputation of the parties hereto, it is agreed by and between the parties that neither party shall solicit the cancellation of business which has at any time been written by the other party, and neither party will utilize the records to which joint access is hereby given, in any manner to violate any confidence reposed in the other party by third persons, including among such persons insurance companies, agents or brokers.  *  *  *  .

"*Ninth*—This agreement shall be binding upon the parties hereto for and during a period of five (5) years from the date hereof unless terminated sooner or extended by the written agreement of the parties."

The bill alleges that the relationship between the parties was confidential and fiduciary, and that each of the parties was bound to use the utmost good faith as to such records. The amended and supplemental bill further alleges that for the first fifteen months after the signing of the contract the two firms worked along the lines set forth by that instrument with little or no friction, construing the contract as such contract ought to be construed and as contended for by plaintiff in error in said amended bill; that in the fall of 1915 representatives of Witkowsky & Co. noticed that the information furnished said firm did not always correspond with the facts then existing, and that Affeld, Tonk & Co. was omitting from the information furnished, all matters that had occurred since the death of Witkowsky or since the date of said agreement; that various additions. pasted to the applications or other records had been torn off and that certain of the records had been stamped by Affeld, Tonk & Co. "Original," thereby meaning that as to those policies other information of changes occurring since Witkowsky's death was contained in the private books of Affeld, Tonk & Co. but was not furnished to Witkowsky & Co. It appears that the pasters torn off and the information withheld had reference to changes occurring after April 2,

1914, the date of Witkowsky's death, or May 20, 1914, the date of said agreement; that the information furnished to Witkowsky & Co. was correct so far as the records had shown such information at such dates; that upon inquiry and discussion of the matter with representatives of Affeld, Tonk & Co., Witkowsky & Co. was informed that the first named firm would not furnish any information of changes occurring after Witkowsky's death but that it did and would continue to furnish the information called for by the agreement as it construed the agreement, as to everything shown by the records as they stood on April 2, 1914. The bill sets forth at some length and in considerable detail changes made in said underwriting records and matters withheld, apparently all concerning transactions occurring and information obtained after Witkowsky's death. The bill further alleges that mail addressed to the old firm often came to Affeld, Tonk & Co. and was opened by it, and that the information contained therein was being used by that firm for its advantage and not communicated to the firm of Witkowsky & Co.; that there was a disagreement between the parties as to certain policies as to what class they were to be placed in under the contract. The bill further alleges that on several occasions since the execution of said contract James Witkowsky, as representative of Witkowsky & Co., had attempted to examine said records, in accordance with the terms of said contract, during ordinary and reasonable business hours and had been refused access to the same, and alleges that such action and delay have caused the complainant great loss, damage and inconvenience. The bill further alleges on information and belief, that in the event the courts decide that Affeld, Tonk & Co. is not compelled to furnish the information asked for in said amended bill, said Affeld, Tonk & Co. has decided to refuse to furnish any information to the representatives of Witkowsky & Co. or allow said last named company any use and inspection of the records in question. The bill

prays that a receiver be appointed to take charge of said records, who shall be charged with the duty of making the necessary entries and notes on them in order to keep them up to date as to the business of the old firm of Witkowsky & Affeld, and that such records be used, through said receiver, to the equal advantage of both of said firms, and prays that if such relief be not granted in the appointment of a receiver, Affeld, Tonk & Co. and the members of that firm be required to keep said records up to date by making the entries ordinarily made in doing such business, by writing thereon all information that has come in since April 2, 1914, and that said Affeld, Tonk & Co. be required to furnish Witkowsky & Co. the information as to such business of the former firm as it has received since April 2, 1914, and shall also, immediately upon receipt and inspection of all mail that comes addressed to Witkowsky & Affeld, furnish Witkowsky & Co. the information thus received. The bill also contains a prayer for other relief along the same general lines and for such general relief as is just and equitable.

Many points are discussed in the briefs which we shall not attempt to refer to particularly, but we will only discuss the questions that we consider as decisive on the facts in the record.

Much discussion is indulged in by counsel on both sides as to the relations that existed between Affeld, Tonk & Co. and Witkowsky & Co., and as to whether fiduciary or confidential relations existed between the members of these firms, and the rules that should govern in controlling the enforcement of the contract. Counsel for plaintiff in error insists that the members of these two firms, having a joint interest in trade secrets, occupied a fiduciary or trust relationship towards each other, and that therefore they were bound to exercise good faith and fairness towards each other in the use of trade secrets, and that equity will prevent one party from using such trade secrets to the disadvantage or injury of the other; while counsel for defend-

ants in error insist that there are no trade secrets involved in the questions in dispute between the two firms and that no fiduciary or confidential relations existed between the parties.

It is conceded by counsel for defendants in error that upon the dissolution of a firm by the death of one of its members the surviving partner or partners become trustees as to the deceased partner's interest, and that therefore said surviving partners occupy a fiduciary or confidential relation with the representative of the deceased partner. With this conclusion we agree. The surviving partners on the death of one of the firm are charged with the duty of proceeding at once to settle up the partnership estate. "They become trustees as to the deceased partner's interest, and while there is a community of interest between themselves and the representatives of the deceased partner in the adjustment of the partnership affairs, the partnership for that purpose only has a limited continuance. * * * If they continue business they do it at their own peril." (*Andrews v. Stinson*, 254 Ill. 111.) So long as Affeld continued the business of the old firm before entering into the contract he certainly occupied a fiduciary or confidential relation to the representative of his deceased partner, Conrad Witkowsky, and therefore was bound to exercise good faith and fairness toward such representative until he closed up the business of the old partnership. Before he closed up the business of this old partnership litigation arose between him and the representative of his former partner, and on account of this litigation, and to settle the same, the contract here in question was entered into by all the parties interested. We think it is clear that the general purpose of this contract was to settle all the disputed questions between the surviving partner, Affeld, and the representative of his deceased partner, and that the former partner and the representative of the deceased partner should in the future have equal and identical interests in the good will of the business

and the underwriting records and books of said business; that neither the surviving partner nor the representative of the deceased partner should have a superior right in any of these things, except that the surviving partner and his new firm should be privileged to keep the books and the underwriting records as provided by the contract. This is not only clear from the general wording of the entire contract but is specifically stated in the seventh section quoted above; and this is the construction put upon the contract by one of the attorneys for defendants in error, who also was their attorney when the contract was entered into, in a letter he sent to the attorney for plaintiff in error on November 19, 1915, and which was attached as an exhibit and made a part of the amended and supplemental bill of complaint. In that letter the attorney says: "The purpose of the contract was to give all the parties an equal chance to utilize the existing records in an effort to secure the business formerly controlled by Witkowsky & Affeld. Affeld, Tonk & Co. * * * merely have the right, under the contract, to retain possession of these records, giving Witkowsky & Co. unrestricted access to them, and the only affirmative duty they owe respecting them is to show therein the date of future cancellations of policies." Outside of the last clause in the above quotation we think this is as clear a statement of the meaning and intent of the contract in question as can be given. We think it is obvious, therefore, that it was intended by this contract to establish the same relations between the surviving partner and the representative of the deceased partner as existed between them after the death of Conrad Witkowsky and prior to the making of this contract. If that be the correct construction, then the relations between them thereunder must be considered as fiduciary or confidential. Indeed, that the contract required in its execution the carrying out of these provisions in good faith by all the parties is clearly stated by defendants in error in one portion of their brief in discussing the duties

that rested upon the representatives of the two firms in making monthly examinations of the books and underwriting records. ·Counsel say in their brief: "The services rendered in making these examinations and classifications is plainly of a most personal nature, and unless the parties making it have a detailed knowledge of the business of Witkowsky & Affeld and use it in good faith it is impossible to perform the contract."

Counsel for defendants in error seem to argue, as we understand their brief, that confidential relations could not arise out of an express contract; that they can only arise out of an implied contract. Of course, we agree with them that if there is an express contract existing between the parties with reference to a certain subject matter there cannot exist an implied contract between the same parties as to the same subject matter, (*Kellogg & Co.* v. *Turpie,* 93 Ill. 265; *Siegel* v. *Borland,* 191 id. 107;) but we cannot agree with them that confidential and fiduciary relations cannot arise out of an express contract. In *Morison* v. *Moat,* 9 Hare's Ch. 241, in discussing trust and fiduciary relations and the jurisdiction of a court of equity in those matters, the opinion says (p. 255) : "That the court has exercised jurisdiction in cases of this nature does not, I think, admit of any question. Different grounds have, indeed, been assigned for the exercise of that jurisdiction. In some cases it has been referred to property, in others to contract, and in others, again, it has been treated as founded upon trust or confidence, meaning, as I conceive, that the court fastens the obligation on the conscience of the party and enforces it against him in the same manner as it enforces against a party to whom a benefit is given the obligation of performing a promise on the faith of which the benefit has been conferred." And again, in *Pollard* v. *Photographic Co.* 40 L. R. Ch. Div. 345, in discussing the same subject, the opinion says: "It is quite clear that, independently of any question as to the right at law, the court of chancery al-

ways had an original and independent jurisdiction to prevent what that court considered and treated as a wrong, whether arising from a violation of an unquestionable right or from breach of contract or confidence."

Counsel for defendants in error insist that the relation existing between these parties now is plainly hostile, and seem to argue that it was when they entered into this contract. There can be no question that it is hostile now, but when the contract was executed it was for the purpose of avoiding a conflict over their joint interests, so that they might be able to act thereafter amicably. A fiduciary relation exists between parties where there is a relation of trust and confidence between them,—that is, where confidence is reposed by one party and the trust accepted by the other. (*Mayrand* v. *Mayrand,* 194 Ill. 45; *Beach* v. *Wilton,* 244 id. 413.) There can be no question that when this contract was entered into each party thereto trusted in and had confidence that the other party would carry out the agreement, otherwise the contract would never have been executed. It is clear, under the authorities, that it cannot be definitely or accurately stated just what constitutes fiduciary relations between parties. In Pomeroy's Equity Jurisprudence (vol. 2, 3d ed. sec. 956,) the author, in discussing this question, says: "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal." "The courts have frequently extended some of the principles which control fiduciary relationship to cases where such relations were not involved." (*State* v. *Illinois Central Railroad Co.*

246 Ill. 188.) Again, this court said in the case last cited (p. 240) : "In the transactions essential to the performance of this charter contract the parties do not deal at arm's length and upon an equal footing. Trust and confidence must be reposed by the State in the absolute honesty and fair dealing of the railroad company. A fiduciary relation, in the strict use of that phrase, does not exist between the State and appellee. Beyond question, however, the relations between these parties are similar in some respects. The obligation rests upon appellee to make true and accurate statements of its gross receipts to the State. In a proceeding of this kind the relations of the parties under this charter are such that the burden of proof rests upon appellee to show that such semi-annual statements are true and accurate." In Bispham's Principles of Equity (9th ed. sec. 92,) the author states that a trustee cannot acquire rights of any nature antagonistic to his beneficiary. He also states (sec. 93) as follows : "The rule under discussion applies not only to persons standing in a direct fiduciary relation toward others, such as trustees, executors, attorneys and agents, but also to those who occupy any position out of which a similar duty ought in equity and good morals to arise. Thus, it will be enforced against partners, tenants in common, tenants for life, tenants for years, mortgagees, a husband, a wife, attorneys at law and vendees under articles, in favor of co-partners, co-tenants, tenants in remainder, landlords, mortgagors, a wife, a husband, clients and vendors, respectively. It has been applied as against the receiver of a corporation and his confidential clerk, and it has been enforced against directors of corporations in favor of stockholders." Even if it cannot be said, in strictness, that fiduciary relations, in the ordinary sense of the term, did exist under this contract between the parties, it is clear, in our judgment, that the relations between them are similar under said contract, in some respects, to what are ordinarily understood as fiduciary relations, and

that the utmost good faith must exist on the part of both parties in attempting to carry out the contract in accordance with the spirit of its provisions. We agree with the contention of counsel for defendants in error that the rights of the parties now arise out of the contract directly and not from any implied contract. The only purpose of considering the relations of the parties before the contract was entered into is to assist in getting a clear understanding as to the meaning and intent of the contract itself.

Counsel for defendants in error further insist that the underwriting records do not contain trade secrets and that such records are not considered by the courts as having property value. The bill specifically alleges that these underwriting records do contain trade secrets and that they are the most valuable part of the assets of the old partnership. As this bill was disposed of on demurrer it needs no citation of authorities to show that the allegations of the bill on these points must be held controlling as to both these questions,—that is, that these underwriting records do contain trade secrets and that the records are a valuable asset of the former partnership. If counsel for defendants in error believed these records were not trade secrets they could have answered and made proof upon that question and then there might have been some ground for contending on the record that they did not contain trade secrets, but in the present state of the record we do not see any basis for such an argument. The same may be said as to such records being an asset of value. Counsel's argument on this last point seems to be that these underwriting records practically are only the good will of the business and therefore are not an asset of the old firm. As the law now stands we do not think there is merit in this argument. There are some early decisions that the good will of a firm was not part of the partnership stock so that the personal representative of a deceased partner could compel a sale thereof but that the good will went absolutely to the sur-

viving partners; and this may be true now in the case of a purely professional business or practice, but at the present time the good will of a co-partnership is usually considered as an asset in which the estate of a deceased partner is entitled to share and which must be sold as part of the assets of the firm, and when it has any value a due proportion belongs to the estate of the deceased partner. (12 R. C. L. 992. See to the same effect, 20 Cyc. 1276, and cases cited in both of these authorities.) It was held by this court in *Douthart* v. *Logan*, 190 Ill. 243, that the partners by their actions and contract in that case showed that they did not consider the good will of the business of any value, and that therefore the courts would not consider such good will of value as an asset of the old firm in which the deceased partner had an interest.

Counsel for defendants in error argue that Conrad Witkowsky and Affeld, Sr., plainly showed that they did not consider the good will or underwriting records of any value when they entered into the contract, a little over a year before Conrad Witkowsky's death, allowing the business to be carried on on the basis of one-third of the profits to Witkowsky and two-thirds to Affeld, Sr., or they would not have made that sort of an arrangement. With this conclusion we do not agree. It is clear from the allegations of the bill, read in connection with the contract entered into between Conrad Witkowsky and Affeld, Sr., that the contract was entered into largely because of the poor health of Witkowsky and because he could not give active attention to the business. He might well have thought that the advantage of receiving at least $3500 a year, or one-third of the profits if one-third was more than $3500, when he was not giving active attention to the business, was a fair equivalent for any good will he might have in the business, measured on the basis of the difference between one-third and one-half of the interest. Moreover, reading all the authorities that have been cited by counsel on both sides with

reference to the value of the underwriting records as an asset, we have no doubt, not only from such decisions but from the facts that must be conceded to be true as alleged in the amended and supplemental bill, that such underwriting records do have a value and have been so held to be of value in various decisions involving somewhat similar questions. See *Dyer* v. *Shove,* 20 R. I. 259; *Barclay* v. *Barclay,* 155 N. Y. Supp. 221; *Thompson* v. *Winnebago County,* 48 Iowa, 155; *Holden's Admrs.* v. *McMakin,* 1 Parson's Eq. Cas. 270.

We find much discussion in the briefs as to whether or not any affirmative duties rested upon defendants in error with reference to keeping these underwriting records other than noting the future cancellations of policies, which is definitely provided for in the contract and which it is conceded by counsel for defendants in error it was their duty to note. We think it is evident from reading the entire contract that they were to keep the underwriting records of the old firm up to date, the same as was the custom in any insurance business to keep such records for future reference. Clearly, under the contract it was the intention that these records should be kept so that they would be of equal value to all the parties to the contract when they attempted to look up information therefrom. If the contract should be construed as contended for by defendants in error, so that all information with reference to changes in the location of property or the addresses of· the insured, and the like, was not noted on these original records but was noted on the private records of Affeld, Tonk & Co., then, clearly, these old records would not be kept in such a manner as to be of equal value to all the parties to the contract, for, according to the allegations in the amended bill, there was a note on these records indicating that such information could be found on the private books of Affeld, Tonk & Co., which, of course, were not open and subject to examination by Witkowsky & Co. If all such information

was not to be noted on these underwriting records as to the business of the old firm we cannot see how the contract could be construed as contemplating that both firms should have equal benefit and advantage from the records, and we cannot see why there should be a provision in the contract that a representative of each of the new firms should monthly examine these records and decide which business belonged to each firm unless such representatives could find from the records just the situation of that business. For fifteen months after this contract was entered into it is clear from this record that both parties construed it as contended for by counsel for plaintiff in error, and that defendants in error kept these books in such a way as to furnish all the information which plaintiff in error desired and is now contending she has a right to have. Of course, it is true that if the contract was clear and specific in its terms as not requiring any affirmative action on the part of defendants in error in keeping these books except to note future cancellations, then the interpretation placed upon the contract by the parties themselves should not be considered in assisting in its interpretation. In view of what we have said we think it is manifest that the contract should not be construed as contended for by counsel for defendants in error, and therefore there is force in the argument that we should refer to the interpretation placed upon the contract by the parties themselves during the first fifteen months of its existence.

Counsel for defendants in error argue at considerable length that this bill is one for the specific enforcement of a contract between the parties, and that the relief asked for is practically in the nature of a mandatory injunction restraining a breach of a negative covenant in a contract, and that that sort of a contract will not be specifically enforced by courts of equity. We think the bill prays for other and different relief than simply a mandatory injunction to restrain defendants in error from a breach of the contract,

and that therefore the decisions cited, such as *Ulrey* v. *Keith,* 237 Ill. 284, and *Bartholomae Malting Co.* v. *Modzelewski,* 269 id. 539, are not decisive on the question as to whether or not a court of equity will take jurisdiction in this case. If the sole purpose of this bill was to enforce a contract specifically, and was, in effect, only a prayer for mandatory injunction to enforce a negative covenant in a contract, requiring specific performance in order to so enforce it, then those authorities would control.

The bill alleges that Affeld, Tonk & Co. has at times entirely and arbitrarily excluded James Witkowsky, the representative of plaintiff in error, from examining said underwriting records. Beyond question, under the wording of the contract the representative of plaintiff in error had the right to unrestricted examination of these records in accordance with the terms of the contract. This does not mean that Witkowsky should have exclusive opportunity, during all the business hours of every day in the week, to have possession of the records and examine them, but means a reasonable opportunity to examine such records at any time during the business hours of the day, so as not to unnecessarily interfere with the same right of examination by representatives of the defendants in error. Under the contract defendants in error have no right to arbitrarily exclude the representative of plaintiff in error from examining these records, and if a court of equity has jurisdiction in this matter, (as we must hold it had under the allegations of the bill that trade secrets are involved and that the relations between the parties were fiduciary in their nature,) then this prayer for relief, in order to prevent defendants in error from arbitrarily excluding the proper representative of plaintiff in error from an examination of these records, is sufficiently meritorious to require a court of equity to take cognizance of this amended and supplemental bill, and in our judgment is sufficient reason for holding that the trial court should not have sustained the

demurrer and dismissed the bill for want of equity. It is not necessary, in order to sustain a prayer for relief in a court of equity, that all the allegations in the bill should be sustained in order to prevent the bill being dismissed for want of equity, on demurrer. The demurrer should be overruled and the bill heard on the merits if there is any allegation in the bill justifying relief in equity.

There is another reason why we think the bill should not have been dismissed for want of equity on the hearing on the demurrer. The amended bill alleges that these underwriting records contained trade secrets, (and these allegations must be held to be based on facts, as stated before, because the bill was heard on demurrer,) and it has always been held, so far as we are advised, that trade secrets cannot be used by one of the parties thereto to the injury of the other and that equity has jurisdiction to prevent such use. While, as we have already stated, it is not necessary to hold that the relations between these parties were strictly what is known as fiduciary or confidential, it is clear that the duties imposed by this contract cause a relationship very similar to a confidential one, and that equity will take cognizance of and protect parties in interest against the wrongdoing of their associates in carrying out a contract where confidential relations exist, out of which one of the parties has derived information or secrets concerning the other or the other's business. Equity fastens an obligation upon such party's conscience not to divulge such knowledge, and enforces the obligation, when necessary, by injunction. Thus, any persons who in the capacity of agents have obtained the custody of the books and documents of their principals or have come into possession of secrets relating to their affairs will be restrained from making them public, (1 High on Injunctions,—4th ed.—sec. 19,) and by a similar line of reasoning it necessarily follows that such agents will be prevented from using them for their own advantage. (See *Pollard* v. *Photographic Co. supra; Macbeth* v. *Schnel-*

*bach,* 239 Pa. St. 76; *Merchants Syndicate Catalogue Co.* v. *Retail Catalogue Co.* 206 Fed. Rep. 545; *Stevens & Co.* v. *Stiles,* 29 R. I. 399; *Oxypathor Co.* v. *DeCordero,* 149 N. Y. Supp. 513; *Morison* v. *Moat, supra; Merry-weather* v. *Moore,* L. R. (1892) 2 Ch. 518; *Pressed Steel Car Co.* v. *Standard Steel Car Co.* 210 Pa. St. 464.) In one of these decisions an employee was restrained from using a list of names of customers and addresses which he had compiled while employed by the firm. The other decisions lay down a similar doctrine.

If these underwriting records of the business of the old firm were to be used for the equal benefit and advantage of each of the new firms, and they contained trade secrets, as must be conceded on the pleadings, then, if the rights of all the parties could not be otherwise protected, a court of equity would have authority to appoint a receiver, as prayed in this bill, and permit each of the new firms, through the receiver, to obtain information from these records desired by either. In *Simmons Hardware Co.* v. *Waibel,* 1 S. D. 488, the opinion says (p. 496) : "One of the grounds upon which a receiver will be appointed is that there is no other adequate remedy. In this case the remedy by injunction is not adequate to accomplish the ends of justice. * * * The flexible nature of the equitable jurisdiction of courts of equity enables that court to so mould and administer its remedies as to prevent such fraudulent and wrongful use of the catalogue in question by at once placing it within the control of the court, and thus placing it beyond the power of the defendants to make any improper disposition of it pending the suit by taking it beyond the jurisdiction of the court. We are clearly of the opinion that under the established jurisdiction of courts of equity the power exists in that court to take into its possession this catalogue, and we think, under the evidence, it was clearly the duty of the court to do so." (See, as laying down a somewhat similar doctrine, *Case Plow Works* v. *Case Threshing Ma-*

283 — 37

*chine Co.* 162 Wis. 185; *Barclay* v. *Barclay, supra; Pomeroy Ink Co.* v. *Pomeroy,* 77 N. J. Eq. 293.) We do not hold that a receiver ought on this record to be appointed in this case, but if on a hearing on the merits it is shown by the evidence that the interests of all parties, under the terms of the contract, cannot be fully protected without the appointment of a receiver, there can be no question of the authority of a court of equity to appoint one to take charge of these underwriting records and see that the interests of all parties are protected and the information furnished to all parties to the contract according to its terms as herein construed. Neither do we hold that if this amended bill is answered and the case heard on the merits the conclusion must necessarily follow that trade secrets are involved in this proceeding. That question must be decided on the merits in view of the evidence taken on the hearing, considered in the light of the rules of law heretofore referred to in this opinion.

Counsel for defendants in error also argue earnestly that a receiver cannot be appointed under this bill, as against the surviving partner of Witkowsky & Affeld, if there be any unsettled claim against Witkowsky's estate in favor of Affeld. The authorities they cite on this question, such as *Clay* v. *Freeman,* 118 U. S. 97, are not in point here. There is no showing on this record that Charles E. Affeld, the surviving partner of the old firm, had any unsettled claim against the estate of the deceased partner, Conrad Witkowsky. Furthermore, this bill, if upheld at all, as strenuously argued by counsel for defendants in error in their briefs, must be upheld as based on the contract between the surviving partner and the heirs of the deceased partner. There was a settlement as to these books between the heirs and the surviving partner by this contract, and therefore any right of the surviving partner to have possession of the partnership books until the settlement of any claim he might

have had against the estate of the deceased partner has been superseded by his rights under this contract of settlement.

The allegations of the bill stated on information and belief are to the effect that if the courts hold against plaintiff in error in this proceeding defendants in error intend to deprive plaintiff in error of all use of said underwriting records and prevent her from obtaining any information thereafter from them. If under this contract courts of equity are compelled to permit this, then plaintiff in error would be deprived of all benefits and advantages which this contract was intended to give to said plaintiff in error. Certainly courts of equity are not so limited in their authority and jurisdiction as to permit defendants in error to deprive plaintiff in error of all benefits in this contract for the five years during which it is to be in force. It is clear from the contract that the parties intended that all should have equal benefit and advantage of this contract for five years, and at the expiration of that time it is fair to presume that the parties would have all the information, and that keeping these old underwriting books accessible thereafter to both parties would not be of any peculiar or special advantage to either of them; that the old business would have been renewed in such a way by the various parties that they could have all the advantage thereof without keeping these books accessible to all parties.

Counsel for defendants in error also argue that equity will not enforce the specific performance of a contract when it lacks mutuality or where the power exists on the part of either party thereto to revoke it at will, and they claim that under the provisions of this contract Affeld, Tonk & Co. can end it by giving up the possession of said underwriting records, and, of course, the contract under its terms will also be ended if all the parties thereto go out of the insurance business before the end of the five years, because it specifically provides that they cannot assign their inter-

ests to new parties if all of the old members of both firms cease to do an insurance business. We have already stated that this bill is not based upon the principle of enforcing by mandatory injunction this contract, and therefore it is unnecessary to discuss the authorities relied on by counsel for defendants in error to sustain their argument on this point. They are the same or similar in effect as the authorities already referred to, that a court of equity will not compel by a mandatory injunction the specific performance of the negative covenants in a contract. Counsel for defendants in error seem to base their argument on the broad proposition that a court of equity never enforces a contract where the power of revocation exists therein. The authorities cited do not lay down this broad doctrine. Those decisions do hold that relief in equity will not be granted in a certain class of cases if power rests in one of the parties to the contract to nullify the relief granted, but no case has been cited, and we find none, which holds that a court of equity has no power to enforce a contract where one party is actually keeping alive a contract and executing it in his own interest in such a way as to obtain an unfair advantage over the other interested party.

Other reasons have been urged, under the allegations of said amended and supplemental bill, why a court of equity has jurisdiction to relieve plaintiff in error in accordance with the prayer of her petition, and reasons have been urged by counsel for defendants in error why a court of equity should not interfere under these allegations. The conclusions reached as to a court of equity having jurisdiction as to the matters already considered render it unnecessary to consider these further arguments urged for or against such jurisdiction.

For the reasons already stated, we think the trial court erred in dismissing this bill on demurrer for want of equity and that the Appellate Court was wrong in affirming that decree.

The judgment of the Appellate Court will be reversed and the cause remanded to the circuit court, with directions to that court to overrule the demurrer, and for other proceedings in harmony with the views herein expressed.

*Reversed and remanded, with directions.*