In the Matter of the Accounting of GRACE Q. BROWN et al., as Executors of and Trustees under the Will of STEPHEN H. BROWN, Deceased.

GRACE Q. BROWN et al., Individually and as Executors and Trustees, Appellants; DEREK RICHARDSON et al., Respondents.

Decedent's estate — executors and administrators — partnership—" good will "— accounts of executors of deceased partner surcharged for failure to collect value of interest in " good will "—" good will " presumptively an asset but partners may contract expressly or by implication that it be not so considered — inference one of fact to be drawn from every relevant circumstance affecting intention of partners — permissible inference that by tacit understanding between partners there was to be no accounting for " good will "— name of living man in style or title of partnership — continuity of name may not be transferred without his consent — value of benefits of " continuity of place " and of such continuity of name as would belong to a " successor " to a firm of stockbrokers carrying on " general commission," " odd lot " and " specialist " business may be nominal — provision in will relieving executors from mistakes or errors of judgment.

1. Good will, when it exists as incidental to the business of a partnership, is presumptively an asset to be accounted for like any other by those who liquidate the business. The course of dealing, however, can stamp it with a different quality. Partners may contract that good will, though it exist, shall not be considered as property or as an asset of the copartnership. The contract may be expressly made,

or it may arise by implication, from other contracts and the acts and conduct of the parties. Such an implication will be drawn the more readily when the good will, if any, is tenuous or doubtful, but the inference is one of fact, to be drawn, if at all, after intention is appraised and probabilities are measured by a scrutiny of the life of the business for every relevant circumstance affecting the intention of the partners.

2. Where, in the course of a partnership business, new members were admitted from time to time without change in the firm name, good will was not mentioned in the partnership articles or in any books of account, incoming members paid nothing for it and one member retired without being paid anything for his share in it, the trier of the facts, in a proceeding to surcharge the accounts of executors of a deceased partner for failure to collect the value of his interest in the good will, might not unreasonably infer that by tacit understanding between the partners there was to be no accounting for good will.

3. Assuming, however, that the disposition of good will had not been varied by agreement, an examination of the record discloses that a buyer of this good will, if it had been put up for sale by the liquidating partners, would have had the benefit at most of continuity of place and of such continuity of name as would belong to a " successor." Writ large in the style or title of the partnership was the name of a living man who had done nothing by word or act to give the name a reality or a significance external to himself. A buyer of the good will would gain no right to the use of any style or title, whereby this man would be represented as still a partner in the business, without his consent, and, in the record, there is neither finding of consent nor evidence pointing to the conclusion that consent should be implied. (*Slater* v. *Slater*, 175 N. Y. 143, limited.)

4. The value of the benefits of " continuity of place " and of such continuity of name as would belong to a " successor," must be determined by their relation to the several departments of the commission business carried on by the partnership. As to the general commission branch, there is a finding, unanimously affirmed, that appurtenant thereto there was an element of good will not incapable of conveyance. The relation of stockbroker and customer is not so distinctly personal or professional that good will is excluded either for reasons of public policy or as an inference of law, but it may be doubted whether a privilege so uncertain to result in custom would be worth a great deal and the surrogate would have been justified in placing the value at a much lower figure than he did or even at a nominal amount. The " odd lot " and " specialist " business are personal and individual and a buyer of the good will would gain nothing in respect of these branches of the business from continuity

of place or from announcing himself the successor to the business without continuity of name. A finding, therefore, that these branches of the business had in them an element of good will for which the survivors are accountable, is erroneous.

5. A provision in the will of the testator whereby his executors are relieved of responsibility for mistakes or errors of judgment may become important upon a rehearing in determining liability for the value of the good will, if any, incidental to the commission business. In the event that the value of such good will shall be found to be doubtful or insignificant, the surrogate may properly conclude that the failure to collect it was an error of judgment and nothing more.

*Matter of Brown*, 211 App. Div. 662, reversed.

(Argued November 25, 1925; decided January 12, 1926.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department entered February 6, 1925, which affirmed a decree of the New York County Surrogate's Court surcharging the accounts of the executors of and trustees under the will of Stephen H. Brown, deceased.

*Franklin B. Lord* and *Sherman Baldwin* for appellants. Vernon C. Brown had a right to continue in business with his partners using his name without being accountable to his brother's estate. (*Meneely* v. *Meneely,* 62 N. Y. 427; *Romeike, Inc.* v. *Romeike & Co., Inc.,* 179 App. Div. 712; 227 N. Y. 561; *Koehler* v. *Sanders,* 122 N. Y. 65; *Higgins Co.* v. *Higgins Soap Co.,* 144 N. Y. 462; *Schinasi* v. *Schinasi,* 169 App. Div. 887; *Henry Mfg. Co., Inc.,* v. *Henry Screen Mfg. Co., Inc.,* 204 App. Div. 27; *Hildreth* v. *McCaul,* 70 App. Div. 162; *Lathrop* v. *Lathrop,* 47 How. Pr. 532; *Ward & Co., Ltd.* v. *Ward,* 15 N. Y. Supp. 913; *Bellows* v. *Bellows,* 24 Misc. Rep. 482; *Piggly Wiggly Corporation* v. *Saunders,* 1 Fed. Rep. 572.) Assuming there was a good will, it was not transferable. (Story on Partnership, § 99.) A property value cannot attach to the name of a business which depends on the personal qualifications of the persons carrying it on. (*Bailly* v. *Betti,* 241 N. Y. 22; *Masters* v. *Brooks,* 132 App. Div. 874; *Read* v. *Mackay,* 47 Misc. Rep. 435;

*Matter of Caldwell,* 107 Misc. Rep. 316; 195 App. Div. 890; *Kremelberg* v. *Thompson,* 87 N. J. Eq. 655; *Underdown* v. *Underdown,* 279 Penn. St. 482, 489; *Rutan* v. *Coolidge,* 241 Mass. 584; *Douthart* v. *Logan,* 190 Ill. 243; 86 Ill. App. 294; *Wightman* v. *Wightman,* 223 Mass. 398; *Force* v. *Roby,* 195 Mass. 292; *Rice* v. *Angell,* 73 Tex. 350; *Smith* v. *Smith,* 51 La. Ann. 72.) In any event the executors should not be surcharged. (*Matter of King,* 71 App. Div. 581; 172 N. Y. 616; *Joseph* v. *Herzig,* 198 N. Y. 456; *Matter of Marx,* 117 App. Div. 890.)

· *Charles Brandt, Jr.,* for respondents. There was a good will which attached to the firm of Vernon C. Brown & Co. (*Wilson* v. *Williams,* 29 L. R. Ir. 176; *Hills* v. *Fearis,* 1 Ch. 466; *Crutwell* v. *Lye,* 17 Vesey, 335; *People ex rel. Johnson Co.* v. *Roberts,* 159 N. Y. 82; *Matter of Silkman,* 121 App. Div. 216; *Niles* v. *Fenn,* 12 Misc. Rep. 471; *Brett* v. *Ebel,* 29 App. Div. 256; *Mott* v. *Mott,* 11 Barb. 127; *Matter of Halle,* 103 Misc. Rep. 661.) The method adopted by the referee for appraising the value of the good will of the decedent in the firm of Vernon C. Brown & Co., and the value of his interest therein, was true and correct in all respects. (*Matter of Bolton,* 121 Misc. Rep. 52.) The Surrogate's Court properly surcharged the account of the executors jointly and severally with the value of decedent's interest in and to the good will. (*Matter of Silkman,* 121 App. Div. 216.)

CARDOZO, J. Vernon C. Brown & Company were stockbrokers for many years in the city of New York. Stephen H. Brown, one of the partners, died. The survivors, denying that there was any good will to be accounted for, continued the business at the old stand and in the old name. The executors acquiesced. For so acquiescing they have been held to be at fault, and their accounts have been surcharged accordingly. The question is whether the decree may be sustained.

The Browns, Vernon and Stephen, were brothers.

They began business in 1895 with one Watson, under the name of Watson & Brown.　In 1901 Watson withdrew, and the brothers went on.　"Vernon C. Brown & Company" became the name of the continued partnership.　New members were admitted from time to time, but the firm name remained unchanged.　Good will was not mentioned in the partnership articles or in any books of account. Incoming members did not pay anything for it.　One member, Mr. Schoonmaker, retired while Stephen Brown was alive.　If good will was an asset, he was entitled to share in it.　The evidence is uncontradicted that nothing was paid him.　We may infer that in the thought of the partners nothing was due.

At the outset, Stephen Brown like his brother was active in the business.　He had a seat on the Exchange, and represented the firm upon the floor.　Falling ill in 1912, he sold his seat, and, though leaving his capital intact, gave no services thereafter.　His share of the profits, which before his illness had been thirty-three per cent, was gradually reduced till at his death in July, 1917, it was only fifteen per cent.　The business was lucrative, though it was run, one would gather, in a more or less old-fashioned and conservative way, without advertising in newspapers or solicitation of accounts.　It had four branches or departments: (1) The general commission business; (2) the so-called "odd lot" business, which proved to be the most lucrative of all; (3) the so-called "two-dollar" business; and (4) speculative business transacted for the firm itself.　There is a finding that all the branches of the business except the last had in them an element of good will for which the survivors were accountable.　The net profits of the three branches were averaged for a period of three years, allowance being made for interest on capital and for the personal services rendered by the partners.　The value of the good will was fixed at two years' purchase price of the profits so computed.　On this basis, the value was $103,891.60, of

which 15%, $15,583.74, was the share due to the estate. The surrogate, confirming the report of a referee, held that the accounts of the executors were to be surcharged for failing to collect this amount from the survivors. The Appellate Division unanimously affirmed.

The books abound in definitions of good will (*People ex rel. Johnson Co.* v. *Roberts*, 159 N. Y. 70, 80; *Von Bremen* v. *MacMonnies*, 200 N. Y. 41, 47). There is no occasion to repeat them. Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition (*cf. Walton Water Co.* v. *Village of Walton*, 238 N. Y. 46, 50). Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty. At the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case.

Good will, when it exists as incidental to the business of a partnership, is presumptively an asset to be accounted for like any other by those who liquidate the business (*Slater* v. *Slater*, 175 N. Y. 143; *Matter of David & Matthews*, 1899, 1 Ch. 378; *Witkowsky* v. *Affeld*, 283 Ill. 557). The course of dealing, however, can stamp it with a different quality. Partners may contract that good will, though it exist, shall not " be considered as property or as an asset of the co-partnership " (*Douthart* v. *Logan*, 190 Ill. 243, 252; *Witkowsky* v. *Affeld, supra*). The contract may " be expressly made," or it may " arise by implication, from other contracts and the acts and conduct of the parties " (*Douthart* v. *Logan, supra*). The implication will be drawn the more readily when the good will, if any, is tenuous or doubtful. Upon this appeal, the form of the findings precludes us from adjudging that the distribution of what would otherwise be an

asset has been varied by agreement. We state, however, for the guidance of the trial court, that evidence exists from which such an agreement may be gathered. The trier of the facts might not unreasonably infer from the course of dealing between the partners when new members came in and old ones went out that by tacit understanding there was to be no accounting for good will. No doubt there must be caution before property interests of value are thus excluded by implication. The life of the business must be scrutinized for every relevant circumstance affecting the intention of the partners. The inference is one of fact, to be drawn, if at all, when intention is thus appraised and probabilities are measured.

Assuming for present purposes that the disposition of good will has not been varied by agreement, we reach the question whether there was any good will to be disposed of upon the facts recited in the findings. To answer that question, we must consider at the outset what rights would have passed to a buyer of the good will if the surviving partners had sold it in the course of liquidation. The chief elements of value upon any sale of a good will are, *first*, continuity of place, and, *second*, continuity of name (*People ex rel. Johnson Co.* v. *Roberts*, 159 N. Y. 70, at p. 83). There may indeed at times be others, *e. g.*, continuity of organization. That element is of value in business of a complex order. Where the business is simple, the benefits of organization are slight and not so easily transmitted. Confining ourselves now to the two chief elements of value, we may assume that the buyer of this good will would have been reasonably assured of continuity of place. The firm offices were the same from the beginning of the business till the death of Stephen Brown and later. There is nothing to show that the survivors, genuinely endeavoring to dispose of the good will, would have been unable to deliver possession to a buyer of the lease. A more difficult question is presented when we ask to what extent there would have

been continuity of name. "Vernon C. Brown & Co." was not an arbitrary symbol, like The Snyder Mfg. Co., *e. g.*, in *Snyder Mfg. Co.* v. *Snyder* (54 Ohio St. 86). It had not gained a secondary meaning supplanting a primary meaning which had been descriptive of a man or men, and instead identifying impersonally an organization or a product. Writ large in this style or title was the name of a living man who had done nothing by word or act to give the name a reality or a significance external to himself. A buyer of the good will would gain no right to the use of any style or title whereby this man would be represented as still a partner in the business. We assume that in conducting the new business he would be privileged to describe himself, subject, however, to the rules of the Exchange, as the "successor" to the old one (*Moore* v. *Rawson*, 199 Mass. 493, 497, 499). He would not be suffered to go farther. One who writes his name at large in the style or title of a partnership does not dedicate to the partnership, by force of that act alone without other tokens of intention, the right to sell the name at auction upon every change of membership.

We do not overlook the provisions of the statute (Partnership Law, § 80, subd. 1; formerly Partnership Law, § 20 [Cons. Laws, ch. 39]) whereby partnership names are made capable of transfer to the successors to a business. The sole effect of that provision is to give the approval of the law to a use that would otherwise be criminal though a transfer were attempted (*Slater* v. *Slater, supra*, at p. 149; *Caswell* v. *Hazard*, 121 N. Y. 484, 496). The statute tells us what the partners are at liberty to assign. It does not tell us what they are under a duty to assign. A case in Wisconsin states their duty in that regard with clarity and precision (*Rowell* v. *Rowell*, 122 Wis. 1). A name which in popular thought is solely or predominantly the name of a living man, may not be sold against his protest as it might if it were the impersonal symbol of an organization or a product. The objection is not merely that the

partner whose name is thus appropriated may be exposed to the risk of liability for debts of the continued business (*Burchell* v. *Wilde,* 1900, 1 Ch. 551; *Thynne* v. *Shove,* 45 Ch. D. 577). If that were all, he might be adequately protected by the certificate which his successors must file under the statute (*Slater* v. *Slater, supra*). He would remain exposed to other perils though this one were averted. Business designed for him might be diverted to some one else. Worse than this, he might suffer in standing or good name " by reason of inferiority of goods or dishonorable business conduct to which he is thereby made ostensibly a party " (*Rowell* v. *Rowell, supra*). A different situation presents itself when the name is " arbitrary or fancy " (*Rowell* v. *Rowell, supra*). The like is true when, though it may have once have designated a person, it has " practically become an artificial one, designating nothing but the establishment " (*Rowell* v. *Rowell, supra,* at p. 20, citing *Rogers* v. *Taintor,* 97 Mass. 291; *Slater* v. *Slater, supra*).

*Slater* v. *Slater* (*supra*), if it stands for more than this, must be limited accordingly. We think that more was not intended. Border cases will at times occur. The *Slater* case was one of them. Even there, however, the court recognized the distinction between names purely personal or individual, and names that had acquired, through the incrustations of time, a veneer of associations artificial and impersonal (*Slater* v. *Slater, supra,* at p. 148). This will happen oftener in trading partnerships than in those where the personal relation, even though not exclusive, counts for more. It will happen oftener where the title contains the surnames only of the members than it will when individuals are identified more sharply (Lindley on Partnership, pp. 540, 541). The question in last analysis is one of probable intention. To answer it we must know whether by reasonable intendment as gathered from the nature of the business and the course of dealing, the partner whose name is appropriated by a

stranger has given consent to his associates to submit to an impersonation so disturbing and deceptive. In the record before us there is neither finding of consent nor evidence pointing to the conclusion that consent should be implied.

We have said that the members of the old firm might compete without restraint, after a sale of the good will, with the members of the new one. There are distinctions in that regard between voluntary and involuntary sales (*Von Bremen* v. *MacMonnies*, 200 N. Y. 41). After a voluntary sale, the seller, though he may compete, may not drum up or circularize the customers of the business. After a sale *in invitum*, he is not subject to a disability so heavy. For the purpose of this distinction, a sale by surviving partners upon a liquidation of the business, is a sale coerced by law (*Hutchinson* v. *Nay*, 187 Mass. 262; *Moore* v. *Rawson, supra*). The survivors may indeed be bound as upon a voluntary sale if they have given the transaction such an aspect in the eyes of the buyer (*Caswell* v. *Hazard*, 121 N. Y. 484, 495; Lindley on Partnership, p. 543). The representative of the deceased partner, however, has no cause for complaint if by appropriate recitals or reservations they disclose its involuntary quality and thus limit its effect. Their duty as liquidators is done when they convey what would be conveyed upon a sale by a receiver (*Hutchinson* v. *Nay, supra*).

We conclude, then, that a buyer of this good will, if it had been put up for sale by the liquidating partners, would have had the benefit at most of continuity of place and of such continuity of name as would belong to a " successor." We have next to consider the relation of these benefits to the several branches or departments in which the business was conducted.

(1) There is a finding, unanimously affirmed, that appurtenant to the general commission branch was an element of good will not incapable of conveyance. We cannot say that this finding is qualified by others to such

an extent that as a matter of law it must be disregarded as erroneous.. The buyer of the good will would take over the firm records, which would give the names of the old customers. He would be in a position to notify them that he had succeeded to the business. True the old partners might send out notices that they were still in business for themselves. None the less, some customers might wander into the old place from forgetfulness or habit. Once there, inertia might lead them to give an order to brokers whom they found established in possession (*Hill* v. *Fearis*, 1905, 1 Ch. 466, stockbrokers; *Rutan* v. *Coolidge*, 241 Mass. 584, architects; *Witkowsky* v. *Affeld*, 283 Ill. 557, insurance brokers). The relation is not so distinctly personal or professional that good will is excluded either for reasons of public policy or as an inference of law (*Bailly.* v. *Betti*, 241 N. Y. 22; *Blakely* v. *Sousa*, 197 Penn. St. 305; *Messer* v. *Fadettes*, 168 Mass. 140). We may doubt whether a privilege so uncertain would be worth a great deal. The surrogate would have been justified in placing the value at a much lower figure than he did, or even at a nominal amount (*Rutan* v. *Coolidge, supra*). The question is not whether the buyer would be willing to pay much or would be making a wise bargain. The question is whether a reasonable man would be willing to pay anything.

(2) The odd lot business stands on a different basis. Its essential characteristics are established by the findings. There is a rule of the New York Stock Exchange by which the unit of trading on the floor of the Exchange is declared to be one hundred shares. Dealings in smaller numbers of shares are known as odd lot transactions. Most stockbrokers do not transact an odd lot business, but there are some that do, and Vernon C. Brown & Company was one of them. Orders for odd lots do not come through the office. They are given on the floor of the Exchange to the individual member or members of the firm who are its floor representatives. They come invariably from

other brokers communicating with fellow-members of the Exchange whom they know as individuals.

A buyer of the good will would gain nothing in respect of this branch of the business from continuity of place. There was no relation between such orders and the place where the firm business was transacted. He would gain nothing from the privilege of announcing himself the successor to the business without continuity of name. The individual brokers who had been accustomed to receive these orders from fellow-members of the Exchange would still be on hand to receive them as before. The findings suggest no reason why business so individual and personal should be diverted or diminished. Very likely the new firm, when announcing its succession to the business, would advertise the fact that its board members, if there were any, would buy and sell odd lots. It might advertise a like readiness though the business it was starting had no relation of succession to any that had gone before. The appeal to favor would be hardly stronger in one case than in the other. The situation would be different if the old partners had been about to withdraw from the field of competition. While they remained in the arena, the tie of succession was too attenuated to give to the buyer in transactions so individual and personal a fair promise of advantage. One cannot gain a foothold upon a ledge of opportunity so narrow. Expectancy in such conditions may be said to have reached the vanishing point at which it merges in illusion.

(3) The " two-dollar " or " specialist " business is personal and individual like the department just considered. The specialist is a broker who remains at one post of the Exchange where particular stocks are dealt in and there executes orders received from other brokers. He receives a commission of $2.50 for every 100 shares. Good will does not attach to business of this order for the same reason that none attaches to dealings in odd lots.

Mention should be made in conclusion of a provision of

the will of Stephen Brown whereby his executors are relieved of responsibility for mistakes or errors of judgment. This provision may become important upon a rehearing in determining liability for the value of the good will, if any, incidental to the commission business. In the event that the value of such good will shall be found to be doubtful or insignificant, the surrogate may properly conclude that the failure to collect it was an error of judgment and nothing more.

The order of the Appellate Division and the decree of the Surrogate's Court, so far as such decree is appealed from, should be reversed, and a rehearing ordered, with costs to abide the event.

HISCOCK, Ch. J., POUND, McLAUGHLIN, CRANE, ANDREWS and LEHMAN, JJ., concur.

Order reversed, etc.