Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on May 5, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Bules of the court has expired. Defendant filed a notice of intention to except to the report but on June 29, 1967, filed a request for leave of court to withdraw the notice of intention to except wherein it requested that the court adopt as its decision the report of the commissioner filed May 5, 1967. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amount of recovery to 'be determined pursuant to Bule 47 (c).
OPINION Of COMMISSIONER*
Bennett, Chief Commissioner:
Plaintiffs, Harry C. Miller and Winifred Miller, husband and wife, bring this action to recover federal income taxes and interest thereon attributable to certain payments made by Mr. Miller to his former business partner in 1958, pursuant to an agreement they had to terminate their partnership. Mrs. Miller is a nominal plaintiff, as a joint return was filed. Hereafter, any reference to plaintiff will be to Mr. Miller.
The issue is simply whether payments made by plaintiff, the continuing partner, to the retiring partner, Charles F. Phillips (hereinafter referred to as Phillips), based on a share of the future income Miller expected to receive after dissolution of the partnership, are deductible by plaintiff under section 736 or section 741 of the 1954 Internal Bevenue *334 Code, or whether these payments must be added to plaintiff’s basis of his interest in the partnership. Plaintiff deducted the payments made to Phillips as commissions in the amount of $11,704.01. A deficiency was assessed on the ground that the payments were made for a capital asset. Plaintiff paid the deficiency in the amount of $9,738.90, representing tax and interest, and a claim for refund was denied. The suit here is timely. It is concluded, for reasons appearing hereafter, that the payments by plaintiff are properly deductible by him as the continuing partner under section 736 of the Code. The agreement to terminate the partnership resulted in the liquidation of the interest of Phillips, and payments made to him by plaintiff under the agreement were for the intangible value of good will.
The facts of the case are that in 1947 plaintiff and Phillips orally agreed to form a partnership under the name of Harry C. Miller Co. (hereinafter referred to as the partnership) to operate as a wholesale representative for sporting goods manufacturers. Their understanding was that profits from sales would be shared 60 percent by Miller and 40 percent by Phillips. There was no understanding about the sharing of losses or what would happen in the event of the death of a partner or a split-up in the arrangement.
Beginning in 1951 the partnership became the exclusive representative in 24 states for the Charles Garcia Corporation, the latter the exclusive distributor of an imported spinning reel which was extremely popular with sport fishermen. This popularity resulted in a tremendous increase in business for Garcia. From 1954 through March 31, 1958, Garcia was the partnership’s principal account. The partnership also prospered.
Thomas T. Lenk (hereinafter referred to as Lenk) was the dominant personality in the Garcia Corporation and as president directed its business with a firm hand. Garcia operated through five representatives, including the partnership, and provided all of the advertising and repair service. These representatives had no written contracts with Garcia, the right to represent this company being entirely dependent upon the will of Lenk and his satisfaction with their sales. The arrangement with Garcia, which was the main basis of *335 the success of the partnership, was not something that the partners could sell. Only Lenk could determine who Garcia’s representatives would be.
In 1954, Miller, who was dissatisfied with his partner, tried to terminate the partnership but was thwarted by Lenk who threatened loss of the account. In December 1957, Phillips became ill and inactive in the business. By February 1958, Miller, still desiring to terminate the partnership, discussed it again with Lenk who by this time was agreeable and assured Miller that if the partnership was dissolved that Miller could continue with the Garcia account. Phillips, however, sought the intercession of Lenk on his own behalf. Lenk concluded that Miller had no legal obligation to pay anything to Phillips but that he had a moral obligation to do so and made a suggestion to Miller that Phillips be paid a percentage, for 3 successive years, of the income Miller would expect to receive for his continuation of sales for Garcia. Miller had not intended to pay Phillips anything, but because he wanted to continue this account, he felt that he had no choice in view of Lenk’s attitude.
Lenk then negotiated with Phillips and his attorney. The result was a written agreement between Miller and Phillips dated March 25,1958, whereby they agreed to terminate their partnership, effective March 31, 1958. The agreement, which is in evidence and is summarized in the findings, provided in pertinent part that Miller would receive the physical assets except for the inventory as reflected by a financial statement to be prepared by the partnership accountant as of the close of business March 31,1958.
Under paragraph 3 of the agreement, the debts and taxes were to be paid from partnership assets and, thereafter, distribution was to be made to the parties from partnership funds according to their 60-40 percent partnership interests.
Under paragraph 7 of the agreement, Phillips was to receive a percentage of Miller’s commissions from Garcia commencing April 1, 1958, through March 31,1961, on the basis of 16'% percent for each of the first 2 years and 8% percent for the third year. Other provisions of the agreement permitted Miller to continue the business in his name and to retain the telephone number and lease. It also gave Lenk *336 authority to arbitrate and make binding decisions between the parties on any dispute arising from execution of the agreement. On March 25, 1958, Miller and Phillips filed with the State of New York a statement of discontinuance of their business as partners, and after March 31, 1958, Phillips performed no services for Miller or the partnership.
The payments made to Phillips under paragraph 3 of the termination agreement represented Phillips’ 40-percent share in the receivable commissions shown on the closing balance sheet. These payments totaled $11,264.54. Under paragraph 7, Phillips received $11,704.01 for 1958 and a total of $87,695.72 for the 3 years. Payments under paragraph 7 were made from a new bank account in Miller’s name as a proprietorship account, and the payments under paragraph 3 were from the joint partnership account which was thereafter closed.
It is established by the evidence that Miller and Phillips did not discuss with one another the tax consequences of their termination agreement and had no meeting of minds thereon. The agreement was negotiated for them by Lenk and their respective counsel. Miller’s accountant and his lawyer both advised him and Lenk that payments to Phillips under paragraph 7 of the agreement would, in their opinion, be a deductible expense to Miller and would be in the nature of a continuation of Phillips’ income on a comparable level to what it had been in the year before dissolution of the partnership. This view was not communicated by these parties ¡to Phillips who had a contrary impression that he was selling his interest in the partnership and would be entitled to capital gains treatment, which he was in fact later accorded by the United States Tax Court in Charles F. Phillips, 40 T.C. 157 (1963).
It is fair to say that at the time of the partnership termination the fax consequences were not foremost in the minds of Miller and Phillips, who were primarily interested in dissolving the partnership, and they depended upon Lenk to protect their respective interests. At the trial, however, Phillips testified that he considered that he was selling his interest in the partnership by the agreement and that the payments he would receive under paragraph 7 were for his interests therein and for “good will, the continuation of the 'business, *337 tbe carrying on of the business, the telephone number, the lease on the premises * * He also suggested that it was important to present a “harmonious atmosphere” to the trade since he handled a lot of important accounts and that this was a consideration for the agreement, which incidentally provided that neither party should release any statement about the dissolution without the approval of 'the other.
In analyzing sections 736 and 741 of the Code[1] it is apparent that, in order to determine the deductibility of payments made by the continuing partner to the retiring partner, it must fir,‘it be determined whether the transaction was a sale (§ 741) or liquidation (§ 736) of a partnership interest. Then, in order to determine the tax consequences, it must be decided whether the payments made in excess of the retiring partner’s basis of his interest in the partnership were attributable to unrealized receivables or to good will. If the *338 payments in excess of such basis are attributable to unrealized receivables, then, whether the transaction is a sale or liquidation of a partnership interest, the payments will be deductible by the continuing partner. If the payments in excess of basis are attributable to good will, the tax consequences vary according to whether the transaction is a sale or liquidation. If the transaction is a sale of a partnership interest, since section 741 makes no exception for payments attributable to good will, the payments will be considered capital in nature, and are not deductible by the continuing partner. On the other hand, if the transaction is a liquidation of a partner’s interest, then any payments attributable to good will either will be a distributive share or a guaranteed payment to the recipient, and deductible by the continuing partner.
Congress allowed divergent tax consequences in the 1954 Internal Eevenue Code depending upon whether amounts paid to a withdrawing partner were classified as a “sale” or as “payments in liquidation” of a partnership interest. It did so because of its concern about prior confusing tax treatment of partners and its desire to introduce into the law greater simplicity, flexibility and equity as between partners regarding their tax status.[2] The goal of simplicity was not achieved. David A. Foxman, 41 T.C. 535, 551 (1964), aff’d 352 F. 2d 466 (3d Cir. 1965); see generally, Cary’s discussion on the ALI tax project and the Code. 60 colum. l. rev. 259 (1960). However, there was greater success with the concept of flexibility. The reason for flexibility embraces the delicate nature of a partnership and the tax consequences involved therein. A favorable tax ruling for one partner may very well produce an adverse tax consequence to the other. The Tax Court in Foxman, supra at 551, stated:
* * * Accordingly, one of the underlying philosophic objectives of the 1954 Code was to permit the partners themselves to determine their tax burdens inter sese to a certain extent, and this is what the committee reports meant when they referred to “flexibility.” The theory was that the partners would take their prospective tax liabilities into account in bargaining with one another. * * *
*339 * * * this policy of “flexibility” is particularly pertinent in determining the tax consequences of the withdrawal of a partner. Where the practical differences between a “sale” and a “liquidation” are, at most, slight, if they exist at all, and where the tax consequences to the partners can vary greatly, it is in accord with the purpose of the statutory provisions to allow the partners themselves, through arm’s-length negotiations, to determine whether to take the “sale” route or the “liquidation” route, thereby allocating the tax burden among •themselves. * * *
The Treasury regulations reflect congressional intention of “flexibility.” 26 C.F.E. § 1.736-1 (a) (1) (i) (1956) states:
§ 1.736-1 Payments to a retiring partner or a deceased partner’s successor in interest
(а) Payments considered as distributive share or guaranteed payment. (1) (i) Section 736 and this section apply only to payments made to a retiring partner or to a deceased partner’s successor in interest in liquidation of such partner’s entire interest in the partnership. * * * Section 736 and this section apply ord/y to payments made by the partnership and not to transactions between the partners. * * * [Emphasis added.]
It would appear, under this section, that when a two-man partnership is terminated and the continuing partner promises to pay the other out of his share of future earnings, the transaction would be viewed as a sale under section 741. Since the two-man partnership no longer exists, how could the payments emanate from the partnership? However, 26 C.F.E. § 1.736-1 (a) (6) (1956) provides:
(б) A retiring partner or a deceased partner’s successor in interest receiving payments under section 736 is regarded as a partner until the entire interest of the retiring or deceased partner is liquidated. Therefore, if one of the members of a 2-man partnership retires under a plan whereby he is to receive payments under section 736, the partnership will not be considered terminated, nor will the partnership year close with respect to either partner, until the retiring partner’s entire interest is liquidated, since the retiring partner continues to hold a partnership interest in the partnership until that time. * * *
26 C.F.E. § 1.741-1 (b) (1956) when viewed in conjunction with the aforesaid regulations, further manifests the *340 “flexibility” doctrine mentioned previously. This section provides:
(b) Section 741 shall apply whether the partnership interest is sold to one or more members of the partnership or to one or more persons who are not members of the partnership. Section 741 shall also apply even though the sale of the partnership interest results in a termination of the partnership under section 708(b). Thus, the provisions of section 71^1 shall he applicable {!) to the transferor partner in a %-man partnership when he sells his interest to the other partner, * * *. [Emphasis added.]
A comparison of the applicable regulations evidences the intent that in the termination of a two-man partnership the parties may determine the tax consequences by effectuating a “sale” or “liquidation.” In this case, an examination of the record leaves no doubt that the parties in fact pursued a course leading to the liquidation of a partnership interest. However, it is not possible to find any understanding between Miller and Phillips as to tax consequences of their termination agreement. The plaintiff urges adoption of a finding that since Lenk was the guiding force in effectuating the termination agreement his intention as to the tax consequences should control. The record shows that it was Lenk who conceived the arrangement under paragraph 7 of the termination agreement. Miller had to abide by Lenk’s determination, if he desired to keep the Garcia account. Phillips relied on Lenk to protect his interests. Lenk and Miller, relying on the advice of counsel and an accountant, were satisfied that the paragraph 7 payments would be deductible by Miller. But, there is no evidence from these individuals or from Phillips showing any consideration by them of whether the termination agreement was a sale or liquidation of a partnership interest.
In this regard, it is important to note that a reasonable interpi’etation of sections 736 and 741 of the 1954 Code does not suggest that the parties may manifest their intentions as to deductibility, and thereby determine their tax consequences. As stated earlier, the parties may determine what the transaction is, to wit, a sale or liquidation of a partnership interest. The tax consequences will then be determined *341 by what the transaction is. Under certain circumstances it would be rather easy to ascertain the intent of the parties as to a particular transaction where they manifest an intention as to the tax consequences. As an example, if we were to assume, arguendo, that Lenk was aware of,'and fully understood, the provisions of sections 736 and 741 of the Code, and if he testified that he thought the paragraph 7 payments were for good will, and that he had always thought and intended the payments to be deductible by Miller, we may reasonably deduce that Lenk’s intention was to effectuate a liquidation of a partnership interest. This is so because if one thought the payments were for good will under section 741, the payments would not be deductible by the continuing partner, because that section contemplates a sale of a capital asset.
However, the facts of the instant case present too many variables to make such a simple determination. Even if the view was accepted that the intent of Lenk was controlling, and if it was his intent that the payments to Phillips constituted a liquidation of his partnership interest, they would be deductible by Miller if they were for unrealized receivables or for good will. However, Lenk could just as easily have been of the opinion that the transaction was a sale by Phillips to Miller. If such was the case, the payments to Phillips would still be deductible by Miller if they were made for unrealized receivables (§§ 741, 751 of the 1954 Code); not so, however, if made for good will (§741). It is apparent that the tax consequences as to a section 736 or section 741 transaction will differ under the two sections if the payments to the retiring partner were made for good will. In the present case, it is impossible to deduce what intent the parties had as to the type of transaction, merely by perceiving their intention or Lenk’s intention as to the tax consequences, absent a showing of their awareness of the complexities and pitfalls of these two sections.
It becomes necessary, therefore, to examine the termination agreement, and the other pertinent surrounding circumstances in order to determine what the transaction actually was. The defendant urges consideration of certain facts as relevant in establishing that a sale was accomplished by the parties. The termination agreement stated that the partner- *342 sbip was to be terminated as of March 31, 1958, and Miller was to pay Phillips out of future commissions received by “miller, or such company or corporation with which he may be associated.” The defendant then questions, how could the partnership be entitled to commissions if Miller associated himself with another organization ? How could there be partnership income to pay Phillips according to section 736 (liquidation) if the partnership ceased to exist? The defendant further states that since payments to Phillips under paragraph 7 of the termination agreement were made by checks drawn on a new bank account opened April 1,1958 (the proprietorship’s bank account), while at the same time the partnership account was kept open to pay existing partnership debts and to collect existing partnership receivables, and furthermore that since the partnership filed a Certificate of Discontinuance of Business as Partners with the State of New York on March 25, 1958, how is it possible to say that the partnership continued, and that the payments to Phillips were from the partnership? In this regard, the defendant disregards Treas. Reg. § 1.736-1 (a) (6), supra, which in the case of the retirement of one partner in a two-man partnership, creates the legal fiction that the retiring partner continues to hold a partnership interest with the remaining partner until his entire interest is liquidated. The regulation does not state that the partnership in fact must continue to operate; it creates the legal fiction that it does so for a specific purpose.
The defendant urges the court to adopt the holding in the case of Charles F. Phillips, supra. That case involved the same basic facts as in this case. However, in the Phillips case the Commissioner of Internal Revenue had issued a deficiency against Phillips, taking the position that the payments to Phillips under paragraph 7 of the termination agreement were not capital in nature, and should be taxed to Phillips as ordinary income. The Tax Court held that “it is reasonable to conclude from a fair preponderance of the evidence that the transaction was a sale.” The court further held that Charles F. Phillips was entitled to treat the proceeds of the payments from Miller as a capital gain. The defendant argues that it would be a misuse of the privilege *343 of choice granted to the parties by virtue of sections 736 and 741, for the parties “to draw their agreement so ambiguously that both parties may take advantage of its most favorable aspect and only the Government bear the brunt of their papering over rather than resolving their differences as to who shall 'bear the tax burdens on the distributions.” This point is well taken; however, the Government got itself into such a procedural snarl in the Phillips case that it is difficult to give the case value as a precedent here. The opinion of the Tax Court states that the deficiency notice issued to Phillips explained that it was being asserted, in part, because the payments were “for past services rendered.” Thereafter, the Government stipulated that no part of the payments were for past services, thereby giving away a vast part of its case. Due to this, at the day of the trial, the Government amended its answer to allege that section 736 of the Code should apply. This caused the loss of the presumption of correctness that attaches to the Commissioner’s determination. Furthermore, the court stated that the Commissioner did not plead any facts in his answer to support or explain the allegation made pursuant to section 736. “The court tried unsuccessfully to learn what was meant by the amendment.” [ 40 T.C. at 160.] The court said, further, that since the Commissioner has the burden of proof on the point, “then his pleadings are inadequate since he alleges no facts.” The Tax Court then stated:
* .* * The Commissioner concedes * * * that this section [section 736] applies only “to payments made by the partnership and not to transactions between the partners. That would seem to end the matter since here the agreement was between the partners, the amounts to be paid Charles [Phillips] were not to be paid by the partnership but were to come only from future earnings of Miller, and were to be paid by him. The partnership earned nothing after March 31,1958, and ceased to exist. [40 T.C. at 161.]
The court did not refer to Treas. Reg. § 1.736-1 (a) (6), supra.
In any case, however, the Government’s failure to plead or prove facts, along with the shifting burden of proof which the Government brought upon itself, renders the Phillips *344 case questionable as precedent to resolve tlie instant case claim.
A case which does seem to dispose of this matter quite adequately is Andrew O. Stilwell, 46 T.C. 247 (1966). In that case, the Commissioner (respondent) took the position that the termination of a two-man partnership resulted in a sale under section 741. The court stated:
* * * We disagree with respondent on this score. The October 1, 1962, agreement stated that “the partners desire to terminate and dissolve said partnership” and that “[t]he parties hereto hereby terminate and dissolve the partnership.” It was further provided that “all partnership assets” be transferred to Forsythe and that he pay the indebtedness due the bank and “all other indebtedness of the partnership.” There is not a single phrase which usuall/y accompanies a sale, such as "does hereby transfer, set over, bargain, sell, assign and convey.” [46 T.C. at 250.] [Emphasis added.]
Similarly, in the instant case, the agreement never used the woi’d “sale,” or any other word of similar import, to describe the contemplated transaction. The termination agreement of March 25, 1958, stated that “the parties have agreed to terminate the partnership,” and that the “partnership is dissolved,” and “distribution shall be made to the parties,” and “distributed as partnership property.” As in the Stilwell case, these quoted words indicate that the transaction was a liquidation of a partner’s interest under section 736 of the Code. It is evident, therefore, that there should be some language in the agreement itself which can reasonably support a finding of a sale if it is to be considered as such.[3] When these words are absent, a sale will not be found.
*345 Accordingly, it is concluded tbat the termination agreement of March 25, 1958, and the payments pursuant thereto, effected a liquidation of Phillips’ entire interest in the partnership under section 736 of the Code. This being the case it really does not matter, insofar as plaintiff’s right to recover is concerned, whether the payments pursuant to paragraph 7 were for unrealized receivables or for good will. In either case, the payments will be deductible as a distributive share of partnership income under the legal fiction created by 'the regulations that the partnership continued until the payments were all made. In this case, it was more than a fiction. As the payments were based on a percentage of the commissions Miller would earn, Phillips’ continuing interest in the success of the business was rewarded handsomely and, apparently, to a greater extent than anticipated. As it turned out, Phillips got more than Lenk had in mind that he should. It is found, however, that the payments made under paragraph 7 of the termination agreement were, in fact, made for the intangible asset of good will although it was not identified by the termination agreement and plaintiff does not admit it.
Plaintiff’s brief demonstrates awareness of the differing tax consequences possible under sections 736 and 741, should the court find that the partnership had good will. Therefore, the plaintiff urged that the payments were made for unrealized receivables, in which case, whether the transaction is a sale or liquidation, the payments are deductible by Miller. In this regard, the Code and the Treasury regulations are of some assistance. Section 751(c) of the Code provides in relevant part:
(c) UNREALIZED RECEIVABLES. — For purposes of this subchapter, the term “unrealized receivables” includes, to the extent not previously includible in income under the method of accounting used by the partnership, any rights (contractual or otherwise) to payment for—
(2) services rendered, or to be rendered.
26 C.F.R. § 1.751-1 (c) (1) (ii) (1956) provides in relevant part:
* * * Such rights must have arisen under contracts or agreements in existence at the time of sale or distribu- *346 /fcion, although the partnership may not be able to enforce payment until a later time. For example, the term includes trade accounts receivable of a cash method taxpayer, and rights to payment for work or goods begun but incomplete at the time of the sale or distribution. [Emphasis added.]
Neither the Code nor the regulations define precisely what type of right is intended by the phrase “contractual or otherwise.” However, it appears that Congress was thinking in terms of legal rights to payments, s. rep. NO. 1622, 83d Cong., 2d Sess. 99 (1954). In this regard, the cases decided on this point have all involved fixed legally enforceable contract rights.[4] 6 MERTENS, FEDERAL INCOME TAXATION § 35.85 (1951) states:
The broad scope of the term unrealized receivables is limited only by the fact that it is confined to legal rights to income. Ordinarily such rights would accrue from a contract obligation. They may also accrue under quantum meruit principles where the recipient of goods or services is under a legal obligation to make payment therefor. A mere expectancy of profit, such as favorable relations with customers, would be treated as good will and not as an unrealized receivable. * * *
In the present case, aside from the commissions receivable listed on the balance sheet, the partnership had no contractual rights. It did not have a contract to represent Garcia for any fixed period of time. The arrangement with Garcia was on a day-to-day basis, cancelable at the will of Garcia. The only substantial value of the partnership, as of March 25, 1958, was the expectancy of continuing to represent Garcia, and it was this representation which had produced most of the partnership’s income. Absent a legally enforceable right, there can be no claim that the payments were for unrealized receivables.
The payments under paragraph 7 of the termination agreement, therefore, must have been made for the good will of the partnership. In defining good will, Mr. Justice Cardozo stated that good will is any—
reasonable expectancy of preference in the race of competition. * * * Such expectancy may come from succes *347 sion in place or name or otherwise to a business that has won the favor or [of] its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty; at the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case. [In re Brown, 242 N.Y. 1, 150 N.E. 581, 582 (1926).]
See also Grace Bros. v. Commissioner, 173 F. 2d 170, 176 (9th Cir. 1949).
In the case of Menendez v. Holt, 128 U.S. 514, 522 (1888), the Supreme Court held that good will means—
every positive advantage that has been acquired by the old firm in the progress of its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business.
An examination of the facts in the instant case leaves no doubt that the payments under paragraph 7 of the termination agreement were made for the good will of the partnership. There was a continuity of name and location of the partnership business. An impression was left with the customers of Harry C. Miller Co. that the company was charitable and taking care of Phillips’ health. This bears relevance, not only due to the fact that Phillips handled many important accounts which Miller could now continue to service, but also the image that the company portrayed to the trade in general. It is believed, however, that the most important element in establishing good will in this case was Miller’s reasonable expectancy of continuing as Garcia’s representative. It was through Garcia that Miller received a substantial majority of his commissions. It was Garcia’s products which the majority of Miller’s distributors and jobbers came to Miller to purchase. Miller knew that, if he desired to retain the Garcia account, he would have to accept Lenk’s determination as to the termination agreement. Lenk stated, “* * * our arrangement has always been that we pay him [Miller] commission for sales made as long as the sales are satisfactory.” Miller could reasonably expect to *348 continue as Garcia’s representative and was assured of this by Lenk when the latter agreed to Miller’s wish to terminate the partnership. This obviously is not a legally enforceable right, but an intangible expectancy of profit. It is an expectancy based upon the favorable relationship that Miller had with his chief supplier and his chief source of income. Undoubtedly, this is a “positive advantage that has been acquired by the * * * firm in the progress of its business, * * Menendez v. Holt, supra. It is a “reasonable expectancy of preference in the race of competition.” In re Brown, supra.
Accordingly, it is held that the payments to Phillips under paragraph 7 of the termination agreement were made in liquidation of Phillips’ entire interest in the partnership (§ 736 of the 1954 Code), and were attributable to the good will that the partnership had acquired. Therefore, plaintiff Miller is entitled to deduct from his 1958 income $11,-704.01, representing the amount paid to Phillips in 1958, pursuant to paragraph 7 of the termination agreement and is entitled to a refund because he was denied this deduction.
FINDINGS OF FACT
1. Plaintiffs Harry C. Miller (hereinafter referred to as Miller) and Winifred Miller, husband and wife, resided in New York, New York. They duly filed a joint federal income tax return for the 1958 calendar year with the District Director of Internal Revenue, Manhattan, New York.[1]
2. On the aforesaid joint return, the plaintiff, a cash-basis taxpayer, showed an adjusted gross income of $30,455.20 and a tax liability of $4,959.77. In computing adjusted gross income on his 1958 return, plaintiff reported, among other items, an alleged net loss from business (a two-man partnership) of $517.44. In computing this loss, on schedule C of his 1958 return, the plaintiff deducted $19,724.92 as commissions paid. Of the amount reported as commissions paid, $11,704.01 was paid to Miller’s partner, Charles F. Phillips (hereinafter referred to as Phillips), pursuant to an agree *349 ment made on. March. 25, 1958, between Phillips and Miller to terminate the partnership.
3. The Internal Eevenue Service disallowed the deduction of $11,704.01 and assessed a deficiency on the ground that the payments were made for a capital asset under section 736 or section 741 of the Internal Eevenue Code of 1954, and therefore should have been added to the basis of Miller’s partnership interest. On January 6,1964, the plaintiff paid the District Director the amount of $9,738.90 representing the deficiency in tax and the interest. A claim for refund of this payment, duly filed by the plaintiff on February 1,1964, was disallowed by the District Director of Internal Eevenue, Manhattan, New York. This suit was timely filed thereafter.
4. Prior to April 10,1947, Miller was engaged in business as a sales representative for companies manufacturing fishing equipment, including tackle, rods, reels, lures, and lines. On April 10,1947, Miller and Phillips orally agreed to form a partnership under the name of Harry C. Miller Co. (hereinafter referred to as the partnership). The principal place of business of the partnership at the times relevant hereto was 257 Fourth Avenue, New York, New York. The partnership operated as a wholesale representative for sporting goods manufacturers. At all times their oral understanding was that their partnership gains would be shared 60 percent by Miller and 40 percent by Phillips. Nothing was agreed upon in the event there were losses or in the event of death of a partner or the possibility of a split-up of the partnership. The partnership was on a cash basis of accounting, as were the partners.
5. Beginning in 1948 the Charles Garcia Corporation (hereinafter referred to as Garcia) began to import the Mitchell spinning reel from France. This was one of the first spinning reels to be sold in the United States and its introduction proved extremely popular with sport fishermen. As exclusive distributor, Garcia profited greatly, its gross sales increasing by about tenfold in the 8 years prior to 1958, due largely to this item. Beginning in 1951 the partnership became Garcia’s exclusive representative in 21 Eastern states and in West Virginia, Pennsylvania, and Tennessee. From 1954 through March 31, 1958, this was the partnership’s *350 principal account. Through its own salesmen the partnership sold Garcia products to approximately 250 jobbers and distributors. The partnership received commissions on the dollar amount of its sales.
6. Thomas T. Lenk (hereinafter referred to as Lenk) was the president of Garcia and at all times here relevant was the single most important individual responsible for the success of Garcia’s business. He was responsible for an extensive advertising program, good public relations and a quick, reliable repair service. Garcia operated through five representatives such as the partnership. These representatives did not contribute to the cost of advertising which Garcia supplied. They were not Garcia’s employees in the conventional sense, but were, in fact, completely dependent upon Lenk’s directions as to sales policies and procedures. He looked upon the representatives as employees. They had no written contracts with Garcia, their arrangements being on a day-to-day basis subject to the will of Lenk and his satisfaction with sales. If the partnership was sold, no assurance could be given that the buyer would' be able to represent Garcia. QnlyLenkcoulddeterminethat.
7. In 1954 Miller tried to terminate the partnership but was thwarted when Lenk indicated that he might lose the Garcia account if he did so. In December 1957 Phillips had a heart attack and for a period became inactive in the business. He was hospitalized and spent a period of convalescence at home and in Florida. By February 1958 Miller, wanting to terminate the partnership, discussed it again with Lenk. The latter had become disenchanted with Phillips and now looked with favor upon the proposed dissolution. Lenk gave the impression that Miller could continue with the Garcia account and later confirmed it. Miller, for his part, was willing to give up part of the sales territory, namely, Florida, to Phillips. Phillips did not accept the Florida territory when Miller advised him of this possibility of resolving their differences. Miller then determined to dissolve the partnership.
8. Phillips also sought the intercession of Lenk to resolve the dispute regarding termination of the partnership. Lenk felt that although Miller had no legal obligation to pay *351 Phillips anything, he had a moral obligation to do so while Phillips sought another job. Pie suggested that Miller pay Phillips a share of the commissions Miller would earn from Garcia for a measured period of time and offered to negotiate an understanding upon this basis. Miller previously had no intention of making any payments to Phillips but understood he would have to accept Lenk’s determination if he desired to continue to represent Garcia.
9. It was Lenk’s desire that Phillips receive for 3 years something approximate in income to what he received in 1957. Lenk negotiated an understanding with Phillips and his attorney pursuant to which Phillips agreed to accept from Miller 16% percent of the commissions that Miller would receive from Garcia for a 2-year period and in the third year 8% percent of such commissions. To ease the financial burden on Miller, which a lump-sum settlement would involve, Lenk concluded that the payments should be financed out of Miller’s future earnings. It was understood by all concerned that Phillips was to be paid out of commissions remitted by Garcia to Miller for the said 3 years only if Miller continued to represent Garcia during such period.
10. Miller’s attorney drafted an agreement to terminate the partnership and on March 25, 1958, it was executed by Miller and Phillips. The agreement consisted of twelve numbered paragraphs, in summary as follows:
First: It was agreed that the partnership be dissolved as of the close of business March 31,1958.
Second: The partnership’s accountant was to prepare a financial statement as of the close of business March 31,1958, including commissions due on all merchandise invoiced by the factories prior to that time. Physical assets, except inventory on hand, were to be excluded from the reckoning and transferred to Miller.
Third: All partnership debts and taxes were to be paid. Thereafter, distribution was to be made to the parties from partnership funds according to their respective interests. Any subsequent tax liabilities of the partnership would be borne proportionately by the parties (60 percent by Miller and 40 percent by Phillips).
Fourth: Miller retained the telephone number and physical assets of the partnership except inventory on hand. He *352 assumed tbe existing lease. He retained the books and records. He was given the right to collect any moneys of the partnership in its name for distribution according to the respective interests of the partners.
Fifth: Miller was to have the right to continue the business in the firm name if he desired, and Phillips was to 'have no further rights thereto.
Sixth: Neither party should release any statement without approval of the other as to the dissolution.
Seventh: Commencing April 1,1958, and through March 31, 1961, Phillips was to receive a percentage of Miller’s commissions from Garcia as set forth in finding 9, above, i.e., 16y2 percent for the first 2 years and 8% percent for the third year.
Eighth: Garcia’s statements as to the total amount of such commissions Avould be binding on the parties to the agreement.
Ninth: Should Phillips die before the 3-year period expired, his share of the commissions would be paid to his widow or children, respectively.
Tenth: The partners agreed that aside from this agreement they had no rights against each other arising from the business of the partnership.
Eleventh: They agreed to execute such additional instruments as necessary to effectuate this agreement.
Twelfth: In event of any dispute between the parties Thomas T. Lenk was given authority to arbitrate the same and make binding decisions thereon.
11. On March 25, 1958, Miller and Phillips executed and caused to be filed with the State of New York, a Certificate of Discontinuance of Business as Partners, which stated that Miller had the right to continue to transact and conduct the business under the name of Harry C. Miller Co. After March 31,1958, Phillips performed no services for Miller or the partnership.
12. Payments made to Phillips pursuant to paragraph 3 of the termination agreement totaled $11,264.54. This was $1,000 less than the capital account of Phillips a's indicated by the balance sheet prepared by the partnership’s accountant but is satisfactorily explained by the evidence and is not *353 in issue. The payment made basically represented Phillips’ 40-percent share in receivable commissions referred to in the closing balance sheet. Pursuant to paragraph 7 of the agreement of March 25,1958, Phillips received $11,704.01 for 1958. The total payments he received pursuant to that paragraph were $87,695.72.
13. When the partnership was originally formed it opened a bank account in the name of Harry C. Miller Co. at the Chase Manhattan Bank. This was a joint account and until it was closed, January 7, 1960, either partner could sign checks drawing on the account. Commissions and accounts receivable at the time of dissolution were deposited into this account as collected and the partnership debts were paid from this account. Payment to Phillips under paragraph 3 of the agreement of March 25, 1958, were made from this account.
14. After March 31, 1958, Miller, as sole proprietor, continued to conduct the business formerly conducted by the partnership. On April 1, 1958, a new set of books was opened for the proprietorship and a new bank account was opened at Chase Manhattan in the name of Harry O. Miller Co. Special. Mr. Miller alone had authority to write checks on this account. Garcia commissions earned by Miller went into this account as collected. The payments to Phillips pursuant to paragraph 7 of the termination agreement were made from this bank account.
15. When Lenk conceived the plan for Miller to pay Phillips from possible future commissions he gave scant consideration to the tax consequences but assumed that such commissions would be a deductible business expense to Miller and that Phillips would have to pay income taxes thereon. He did not discuss tax consequences with Miller or Phillips. He considered that the payments to Phillips would be in the nature of a continuation of Phillips’ income on a comparable level to what it had been in the year before dissolution of the partnership. Lenk’s assumption was based in part upon the advice of Miller’s attorney who drew up the agreement to dissolve the partnership, and who expressed this view to him and to Miller. Miller was also advised by the partnership’s accountant that the payments under paragraph 7 of the *354 agreement would be deductible to him. This advice was given to Miller before he signed the agreement of March 25, 1958, and while it was being negotiated by the attorneys for the parties. This entered into Miller’s willingness to pay the prospective commissions to Phillips.
16. Neither Lent nor Miller nor the accountant nor lawyer here involved ever communicated to Phillips what they thought the tax consequences were under paragraph 7 of the termination agreement. It was Phillips’ impression that he was selling his interest in the partnership and would be entitled to capital gains tax treatment. He did not study the agreement carefully as he was mainly interested in getting out of the partnership arrangement and depended largely upon Lenk to protect his interests, although he was represented by counsel. He did not propose or insist upon the use of the word “sale” in the termination agreement and admitted he would have signed almost anything to be released. He considered that the payments he would receive under paragraph 7 were for his 40-percent interest in the partnership and for—
Good will, the continuation of the business, the carrying on of the business, the telephone number, the lease on the premises, * * *.
The name Harry C. Miller Company was synonymous with the people that worked for the Harry C. Miller Company. And as a result, in the trade to keep an extremely harmonious atmosphere this was invaluable. I handled a lot of important accounts.
17. After March 81,1958, the only tax returns filed for the partnership were for quarterly federal withholding and social security taxes. They related to amounts withheld by the partnership from commissions due its salesmen for sales made prior to March 31,1958, and for which the partnership itself had not yet been paid. These returns and the final return filed for the period January 1-March 31,1958, carry the same employer identification number. Miller and his wife filed a joint federal income tax return for the year 1958. This return included schedule C, Profit (or Loss) From Business or Profession. This return reported income and expenses of the business continued by Miller after March 31, 1958, and carried a different employer’s identification number.
*355 ULTIMATE ÍTNDING
18. The termination agreement of March 25, 1958, resulted in the liquidation of the interest of Phillips in the partnership. The payments made to Phillips under paragraph 7 of the termination agreement were made for the intangible value of good will.
CONCLUSION OP LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery is reserved for further proceedings under Eule 47 (c).
In accordance with the opinion of the court, a stipulation of the parties and a memorandum report of the commissioner as to the amount due, it was ordered on December 11, 1967, that judgment for the plaintiff be entered for $7,215.38.

The opinion, findings ofl fact, and recommended conclusion of law are submitted under the order of reference and Eule 57 (a).

 Int. Rey. Code of 1954, ch. 1, §§ 736, 741, 68A iStat. 248, reads as follows: “SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER’S SUCCESSOR IN INTEREST.
“(a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT. — Payments made In liquidation of tie interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered—
“(1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or
“(2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership.
“(b) PAYMENTS POR INTEREST IN PARTNERSHIP.-
“(1) general rule. — Payments made in liquidation- of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of -such partner in partnership property, be considered as a distribution by the partnership and! no-t as a distributive share or guaranteed payment under subsection, (a).
“(2) special rules. — For purposes of this subsection, payments- in exchange for an interest in partnership property shall not include amounts paid for—
“ (A) unrealized receivables of the partnership (as defined in section 751 (c)), or
“(B) good will of the partnership, except to the extent that the' partnership agreement provides for a payment with respect to- good will.
“SUBPART C — TRANSFERS OF INTERESTS IN A PARTNERSHIP * # # *
“SEC. 741. RECOGNITION AND CHARACTER OP GAIN OR LOSS ON SALE OR EXCHANGE.
“In the case of a sale or exchange of an- interest in a partnership-, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory, items which have appreciated substantially in value).”

 H.R. REP. NO. 1337, 83d Cong, 23 Sess. 65 (1954) ; S. REP. NO. 1622, 83d Cong., 23 Sess. 89 (1954).

 The defendant, in support of its contention, cites a number of cases which actuary bear out the plaintiff’s contention, on this point. Although in all of the following cases the court determined that there was a sale under section 741, it is important to note that the word "sale,” or words of similar import were used. Foxnam v. Commissioner, 352 F. 2d 466, 467 (3d Cir. 1965) [“selling, conveying, transferring and assigning all of his right, title and interest”] ; William T. Wheeling, 23 CCH Tax Ct. Mem. 778, 779 (1964) [“sale of * * * interest”] ; Fitzgerald Atkinson, 23 CCH Tax Ct. Mem. 834, 837 (1964) [“bargained and sold, and * * * does sell, assign and transfer * * * ail of his right, title and interest in and to a partnership”] ; Karan v. Commissioner, 319 F. 2d 303 (7th Cir. 1963), affirmimg sub. nom. Leo Melnik, 21 CCH Tax Ct. Mem. 671, 673 (1962) [“assign, transfer and set over * * * interest in said partnership”].
Of course, the true nature of the transaction and intent of the parties must be ascertained. If the “sale” is a sham it will be disregarded and a true sale is not made a liquidation by mere words. Herman Glazer, 44 T.C. 541 (1965) ; Roth v. Commissioner, 321 F. 2d 607 (9th Cir. 1963).

 See Roth v. Commissioner, supra; United States v. Woolsey, 326 F. 2d 287, (5th Cir. 1963) ; John Winthrop Wolcott, 39 T.C. 538 (1962).

 Winifred Hiller is a party hereto only because she filed a joint tax return witli her husband. Hereafter, the word plaintiff or taxpayer will refer to Harry C. Hiller.